1   **WO**

2

3

4

5

6

7                    **IN THE UNITED STATES DISTRICT COURT**

8                       **FOR THE DISTRICT OF ARIZONA**

9

10   Darrel Eston Lee,                   )   No. CV-04-39-PHX-MHM
                                         )
11              Petitioner,              )   <u>DEATH PENALTY CASE</u>
                                         )
12   vs.                                 )
                                         )
13   Charles L. Ryan, et al.,            )   **MEMORANDUM OF DECISION**
                                         )           **AND ORDER**
14              Respondents.             )
                                         )
15                                       )
                                         )
16   _____)

17        Petitioner Darrel Eston Lee is a state prisoner under sentence of death.  He has filed an

18   Amended Petition for Writ of Habeas Corpus alleging, pursuant to 28 U.S.C. § 2254, that he

19   is imprisoned and sentenced in violation of the United States Constitution. (Doc. 52.)[1]  In a

20   previous order, the Court denied Petitioner's motions for discovery, evidentiary hearing, and

21   expansion of the record, and further denied a number of claims.  (Doc. 87.)  This order

22   addresses Petitioner's remaining claims and concludes that he is not entitled to federal habeas

23   relief.

24

25

26

27   _____

28        [1]        "Doc." refers to the documents in this Court's file.

## FACTUAL AND PROCEDURAL BACKGROUND

The Arizona Supreme Court summarized the facts surrounding the crime and Petitioner's arrest, trial, and conviction as follows:

> On December 5, 1991, defendant Darrel E. Lee and a companion, Karen Thompson, approached 57-year-old John Anderson as he was leaving a Phoenix medical clinic and asked him for a ride. When Anderson agreed, they got into his car. Although unarmed, Lee announced that he had a gun and directed Anderson to drive south on the freeway. When they arrived in Chandler, Thompson demanded Anderson's wallet, which contained a small amount of cash, some credit cards, and an automatic teller machine (ATM) card. Thompson, accompanied by defendant, used the ATM and credit cards repeatedly throughout the next five days, both before and after Anderson's murder.

> At some point, defendant suggested that they tie up Anderson and dump him alongside the road. After binding his hands and feet and placing him in a ditch, however, the couple decided not to leave him there. Instead, they put him in the trunk of the car. During most of this time, Anderson was pleading for his life.

> Defendant and Thompson drove back to Phoenix and then toward California, stopping frequently to use cocaine and alcohol. They eventually decided to kill Anderson to avoid apprehension. Defendant stated that he would asphyxiate Anderson with the car's exhaust fumes and obtained a hose for this purpose. The couple discussed the anticipated killing as they continued their journey. Approximately eight hours after placing Anderson in the trunk, defendant and Thompson turned back toward Phoenix.

> Anderson somehow managed to get untied and pry open the trunk of the car. He found a windshield sun screen reading "NEED HELP; CALL POLICE," and held it out of the vehicle. Two men in another car saw the sign and the frightened victim and called the police at the first available telephone. At approximately 11:45 p.m., two officers responded to the call. Because of darkness and rugged terrain in the area, however, they were able to conduct only a rudimentary search.

> Meanwhile, defendant had exited the interstate highway and stopped the car about 10:30 p.m. He and Thompson attempted to suffocate Anderson with car fumes by running the hose from the exhaust pipe into the trunk, but were unsuccessful because Anderson kept pushing up the trunk lid. During a pause in which the couple used more cocaine and discussed the situation, the victim escaped from the trunk and attempted to flee. Defendant chased Anderson and wrestled him to the ground. Thompson then brought defendant a belt, with which he attempted to strangle Anderson. The belt broke, and defendant yelled for Thompson to get a rock. As defendant choked Anderson with his hands, Thompson hit the victim in the head with the rock, fracturing his skull.

> Defendant and Thompson placed the body in the trunk of the car. After driving to California, and then back to Phoenix, the couple eventually went to Tucson. There, they purchased a shovel and buried Anderson in a shallow grave outside the city.

> The foregoing facts are taken primarily from Thompson's testimony.

Defendant initially denied all participation in the crimes, later admitted some involvement with the car and the credit card spending in California, and finally confessed to a defense-requested psychiatrist that he was present during the murder and was holding Anderson down when Thompson struck him. Evidence found at the scene of the crime included the sun shield, pieces of a belt containing blood spatters, defendant's prescription sunglasses, and a rock bearing blood and hair. Anderson's trifocals were found in the trunk of the automobile, along with blood stains matching his type. Information given by Thompson after she entered into a plea agreement in April 1992 led to the discovery of the victim's remains.

On January 28, 1992, a La Paz County grand jury indicted defendant and Thompson on one count each of first-degree murder, kidnapping, theft, armed robbery, and credit card theft. Defendant pleaded not guilty to all charges. Thompson entered a plea of guilty to first-degree murder and armed robbery. A condition of her plea agreement was that she testify against defendant. On November 18, 1992, following a jury trial, defendant was convicted on all counts.

*State v. Lee*, 185 Ariz. 549, 552-53, 917 P.2d 692, 695-96 (1996).

La Paz County Superior Court Judge Michael Irwin sentenced Petitioner to death for the murder and to terms of imprisonment for the other counts.[2] On direct appeal, the Arizona Supreme Court affirmed. *Id.* at 559, 917 P.2d at 702. Petitioner did not seek certiorari.

Petitioner filed a petition for post-conviction relief ("PCR") pursuant to Rule 32 of the Arizona Rules of Criminal Procedure in June 1999. Following an evidentiary hearing, PCR Judge William Schafer denied relief in May 2003. Subsequently, the Arizona Supreme Court summarily denied a petition for review.

Petitioner then commenced these proceedings and filed an amended habeas petition on November 29, 2004. (Doc. 52.) Petitioner moved for discovery, an evidentiary hearing, and expansion of the record on a number of claims. (Doc. 78.) On September 29, 2006, the Court denied Petitioner's consolidated motion and dismissed Claims 1 (in part), 2, 4 (in part), 5-B, 6, and 9-C as either procedurally defaulted or meritless. (Doc. 87.) The Court now addresses Petitioner's remaining claims.

---

[2] At the time of Petitioner's trial, Arizona law required trial judges to make all factual findings relevant to capital punishment and to determine sentence. Following the Supreme Court's decision in *Ring v. Arizona*, 536 U.S. 584 (2002), which held that a jury must determine the existence of facts rendering a defendant eligible for capital punishment, Arizona's sentencing scheme was amended to provide for jury determination of eligibility factors, mitigating circumstances, and sentence.

**PRINCIPLES OF EXHAUSTION AND PROCEDURAL DEFAULT**

A writ of habeas corpus may not be granted unless it appears that a petitioner has exhausted all available state court remedies. 28 U.S.C. § 2254(b)(1); *see also Coleman v. Thompson*, 501 U.S. 722, 731 (1991). To exhaust state remedies, a petitioner must "fairly present" the operative facts and the federal legal theory of his claims to the state's highest court in a procedurally appropriate manner. *O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999); *Anderson v. Harless*, 459 U.S. 4, 6 (1982); *Picard v. Connor*, 404 U.S. 270, 277-78 (1971).

In Arizona, there are two primary procedurally appropriate avenues for petitioners to exhaust federal constitutional claims: direct appeal and PCR proceedings. Rule 32 of the Arizona Rules of Criminal Procedure governs PCR proceedings and provides that a petitioner is precluded from relief on any claim that could have been raised on appeal or in a prior PCR petition. Ariz. R. Crim. P. 32.2(a)(3). The preclusive effect of Rule 32.2(a) may be avoided only if a claim falls within certain exceptions (subsections (d) through (h) of Rule 32.1) and the petitioner can justify why the claim was omitted from a prior petition or not presented in a timely manner. *See* Ariz. R. Crim. P. 32.1(d)-(h), 32.2(b), 32.4(a).

A habeas petitioner's claims may be precluded from federal review in two ways. First, a claim may be procedurally defaulted in federal court if it was actually raised in state court but found by that court to be defaulted on state procedural grounds. *Coleman*, 501 U.S. at 729-30. Second, a claim may be procedurally defaulted if the petitioner failed to present it in state court and "the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred." *Coleman*, 501 U.S. at 735 n.1; *see also Ortiz v. Stewart*, 149 F.3d 923, 931 (9th Cir. 1998) (stating that the district court must consider whether the claim could be pursued by any presently available state remedy). If no remedies are currently available pursuant to Rule 32, the claim is "technically" exhausted but procedurally defaulted. *Coleman*, 501 U.S. at 732, 735 n.1; *see also Gray*, 518 U.S. at 161-62.

Because the doctrine of procedural default is based on comity, not jurisdiction, federal courts retain the power to consider the merits of procedurally defaulted claims. *Reed v. Ross*, 468 U.S. 1, 9 (1984). As a general matter, the Court will not review the merits of a procedurally defaulted claim unless a petitioner demonstrates legitimate cause for the failure to properly exhaust the claim in state court and prejudice from the alleged constitutional violation, or shows that a fundamental miscarriage of justice would result if the claim were not heard on the merits in federal court. *Coleman*, 501 U.S. at 750.

## AEDPA STANDARD FOR RELIEF

Petitioner filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). Under the AEDPA, a petitioner is not entitled to habeas relief on any claim "adjudicated on the merits" by the state court unless that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under § 2254(d)(1), a state court decision is "contrary to" the Supreme Court's clearly established precedents if the decision applies a rule that contradicts the governing law set forth in those precedents, thereby reaching a conclusion opposite to that reached by the Court on a matter of law, or if it confronts a set of facts that is materially indistinguishable from a decision of the Supreme Court but reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000). A state court decision is based on an "unreasonable application" of federal law if the court "identifies the correct governing legal rule . . . but unreasonably applies it to the facts of the particular . . . case" or "unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." *Id.* at 407.

1    Under § 2254(d)(2), a state court decision "based on a factual determination will not be

2    overturned on factual grounds unless objectively unreasonable in light of the evidence

3    presented in the state-court proceeding." *Miller-El*, 537 U.S. 322, 340 (2003).   In

4    considering a challenge under § 2254(d)(2), state court factual determinations are presumed

5    to be correct, and a petitioner bears the "burden of rebutting this presumption by clear and

6    convincing evidence."  28 U.S.C. § 2254(e)(1).

7                                           **DISCUSSION**

8        **Fifth Amendment Due Process Claims**

9        In numerous claims, Petitioner alleges a violation of his right to due process under the

10   Fifth Amendment.  However, it is the Fourteenth Amendment, not the Fifth, that protects a

11   person against deprivations of due process by a state.  *See* U.S. Const. amend. XIV, § 1 ("nor

12   shall any state deprive any person of life, liberty, or property without due process of law");

13   *Castillo v. McFadden*, 399 F.3d 993, 1002 n.5 (9th Cir. 2005).   Because the Fifth

14   Amendment's Due Process Clause does not provide a cognizable ground for relief from

15   Petitioner's state court conviction, these allegations are summarily denied.

16       **Eighth Amendment Claims**

17       Petitioner also alleges Eighth Amendment violations with respect to some of his

18   conviction-related claims.  However, the right to be free of cruel and unusual punishment,

19   by definition, is a protection related to the imposition or carrying out of a sentence.  *See*

20   *Ingraham v. Wright*, 430 U.S. 651, 664, 667, 671 n.40 (1977) (explaining that Eighth

21   Amendment circumscribes only the type of punishment imposable on those convicted); *Bell*

22   *v. Wolfish*, 441 U.S. 520, 536 n.16 (1979) (noting that the Eighth Amendment has no

23   application to pretrial detainees).  Because the Eighth Amendment does not provide a

24   cognizable ground of relief for claims relating solely to Petitioner's conviction, these

25   allegations are summarily denied.

26

27

28
                                           - 6 -

1

**Claim 1**

2

Petitioner contends that the trial court violated his Sixth and Fourteenth Amendment

3

rights when it denied his motion for a change of venue due to prejudicial pretrial publicity.

4

(Doc. 52 at 39-42.) A criminal defendant is entitled to a fair trial by "a panel of impartial,

5

'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Therefore, "if pretrial

6

publicity makes it impossible to seat an impartial jury, then the trial judge must grant the

7

defendant's motion for a change of venue." *Casey v. Moore*, 386 F.3d 896, 906 (9th Cir.

8

2004) (citing *Harris v. Pulley,* 885 F.2d 1354, 1361 (9th Cir. 1988)).

9

Background

10

Seven months before trial, on April 16, 1992, Petitioner wrote a letter to the trial judge

11

stating his dissatisfaction with defense counsel. (ROA 10.)[3] Petitioner complained that "the

12

only thing [trial counsel] has told me to do is take a plea bargain of 25 years to life, he feels

13

he has no chance of winning at trial." (*Id.*) On April 30, 1992, an article published in *The*

14

*Gem*, a La Paz County newspaper, discussed Petitioner's letter to the court, including his

15

comment about plea bargain negotiations and counsel's dismal view of his case. (ROA 35,

16

Ex. B.) Petitioner then sought a change of venue, citing the letter, its publication in the

17

newspaper, the effect that publicity concerning the plea negotiations would have on the

18

public, and his right to a fair trial. (ROA 35.) The court denied the motion without prejudice

19

to renewal during *voir dire* if it became apparent that a significant number of jurors had read

20

and remembered that particular article. (RT 10/19/92 at 8.)

21

22

23

[3] "ROA" and "ME" refer to the four volumes of pleadings and one volume of minute entries from trial and sentencing prepared for Petitioner's direct appeal to the Arizona Supreme Court (Case No. CR-93-0111-AP & CR-93-0323-T/AP). "RT" refers to the reporter's transcripts of Petitioner's trial, sentencing, and post-conviction evidentiary hearing proceedings. "ROA-PCR" and "ROA-PCR-ME" refer to the six volumes of pleadings and one volume of minute entries from post-conviction proceedings prepared for Petitioner's petition for review to the Arizona Supreme Court (Case No. CR-03-0197-PC). The original reporter's transcripts and certified copies of the trial, appeal, and post-conviction records were provided to this Court by the Arizona Supreme Court. (Doc. 74.)

24

25

26

27

28

Following the conclusion of *voir dire*, Petitioner renewed his motion for change of venue, arguing that 28 of the 34 prospective jurors selected from the venire and nine of the 14 petit jurors had read articles about his case.  (RT 11/10/92 at 141-43.)  In ruling on the motion, the court observed:

> That one article with regard to the plea bargain, Mr Politi, concerned me a little bit.  That's why we had that specific question on the questionnaire about people reading The Gem, but I'm not sure why you didn't delve into that.  Perhaps it's because nobody remembered – those few people who read newspaper articles, most indicated they didn't now remember the facts that they had read; . . .

(*Id.* at 142-43.)  The court concluded there was neither extensive pretrial publicity nor the type of publicity that was so prejudicial that Petitioner was entitled to a change of venue as a matter of law.  (*Id.* at 143.)

On appeal, Petitioner argued that the *Gem* article was tantamount to a public admission of guilt and thus prejudice should be presumed.  The court disagreed:

> The argument is unpersuasive. The burden to show presumptive prejudice resulting from pretrial publicity "rests with the defendant and is extremely heavy." *Bible*, 175 Ariz. at 564, 858 P.2d at 1167.  To grant relief, we would have to find that "the publicity was so unfair, so prejudicial, and so pervasive that we cannot give any credibility to the jurors' answers during voir dire affirming their ability to decide the case fairly."  *Id.* at 565, 858 P.2d at 1168.  The article here is a universe away from the type of publicity that "utterly corrupt[s]" a trial, *Murphy v. Florida*, 421 U.S. 794, 798, 95 S.Ct. 2031, 2035, 44 L.Ed.2d 589 (1975), and prejudice cannot be presumed.  Instead of appearing as an admission of guilt, the story plainly implied that defendant disliked his attorney because the latter was ready to give up on the case.  Defendant's request for a lawyer who would adequately defend him can hardly be viewed as a concession of culpability.

*Lee*, 185 Ariz. at 555, 917 P.2d at 698.  The court also rejected the argument that actual prejudice had been established:

> When a motion for change of venue is based on actual prejudice, the defendant must show that he or she will probably be deprived of a fair trial.  *See* Rule 10.3(b), Ariz.R.Crim.P.; *see also State v. Stanley*, 167 Ariz. 519, 527, 809 P.2d 944, 952, *cert. denied*, 502 U.S. 1014, 112 S.Ct. 660, 116 L.Ed.2d 751 (1991).  We review the trial court's ruling for an abuse of discretion, *see State v. Salazar*, 173 Ariz. 399, 406, 844 P.2d 566, 573 (1992), *cert. denied*, 509 U.S. 912, 113 S.Ct. 3017, 125 L.Ed.2d 707 (1993), and find none.  Defense counsel had ample opportunity during voir dire to ask questions about pretrial publicity.  After determining which prospective jurors had read stories about the case, he failed to establish that any of them had seen the article complained of here.  Moreover, all those who expressed any doubt regarding their ability to be fair and impartial were excused.

1    *Lee*, 185 Ariz. at 555, 917 P.2d at 698.

2        Discussion

3        In addressing pretrial publicity, the Supreme Court has discussed two types of

4    prejudice:  presumed prejudice, where the setting of the trial is inherently prejudicial, and

5    actual prejudice, where *voir dire* is inadequate to offset extensive and biased media coverage.

6    *See Murphy v. Florida*, 421 U.S. 794, 798 (1975).  Petitioner does not attempt to prove actual

7    prejudice by showing that any of jurors read the article at issue.  (*See* Doc. 52 at 39-42.)

8    Rather, citing *Rideau v. Louisiana*, 373 U.S. 723 (1963), Petitioner argues that the article

9    reporting his plea negotiations was sufficient in a small county to establish an inflamed

10   community atmosphere such that his trial was inherently prejudicial.  (*Id.*)

11       A court presumes prejudice only in the face of a "trial atmosphere that had been utterly

12   corrupted by press coverage," *Dobbert v. Florida*, 432 U.S. 282, 303 (1977), or a "barrage

13   of inflammatory publicity immediately prior to trial amounting to a huge wave of public

14   passion" that would make a fair trial unlikely.  *Patton v. Yount*, 467 U.S. 1025, 1033 (1984).

15   Another factor is whether the media accounts contained inflammatory, prejudicial

16   information that was not admissible at trial.  *See Sheppard v. Maxwell*, 384 U.S. 333, 360-61

17   (1966).  The presumption of prejudice is "rarely applicable and is reserved for an 'extreme

18   situation.'" *Harris*, 885 F.2d at 1361 (internal citations omitted).

19       The Supreme Court found presumed prejudice in *Rideau*.  In that case, the defendant's

20   detailed 20-minute confession was broadcast on television three times.  373 U.S. at 724.  In

21   a community of 150,000, nearly 100,000 people saw or heard the broadcast.  *Id.*  "What the

22   people of Calcasieu Parish saw on their television sets was Rideau, in jail, flanked by the

23   sheriff and two state troopers, admitting in detail the commission of the robbery, kidnapping,

24   and murder, in response to leading questions by the sheriff."  *Id.* at 725.  As the Supreme

25   Court explained, the televised confession "*was* Rideau's trial," and "[a]ny subsequent court

26   proceedings in a community so pervasively exposed to such a spectacle could be but a hollow

27   formality." *Id.* at 726 (emphasis added).

28

1   In Petitioner's case, the Arizona Supreme Court concluded that the pretrial publicity did

2   not establish an inflamed community atmosphere, stating that the "article here is a universe

3   away from the type of publicity that utterly corrupts a trial." *Lee*, 185 Ariz. at 555, 917 P.2d

4   at 698 (further citation and quotation omitted).   The court further explained that

5   "[d]efendant's request for a lawyer who would adequately defend him can hardly be viewed

6   as a concession of culpability." *Id.* This Court agrees. The publicity in this case is in stark

7   contrast to the media excesses which presumptively deprived the defendant of a fair trial in

8   *Rideau*.   There was no confession, let alone a televised one.   The publicity at issue was

9   neither sensational nor inflammatory. *See Casey*, 386 F.3d at 908-09; *Leavitt v. Arave*, 383

10  F.3d 809, 826 (9th Cir. 2004).   The Court concludes that the Arizona Supreme Court's

11  rejection of this claim was not contrary to or based on an unreasonable application of clearly

12  established federal law; nor was it based on an unreasonable determination of the facts.

13  **Claim 3**

14  Petitioner contends that he was denied his constitutional rights when the trial court

15  improperly "death qualified" the jurors.  (Doc. 52 at 50-53.)   However, Petitioner also

16  concedes that he failed to present this claim in state court. (*Id.* at 52.)  Respondents assert

17  that the claim is now technically exhausted but procedurally defaulted because Petitioner has

18  no remaining state court remedy.  (Doc. 68 at 53.)

19  When a petitioner has failed to fairly present a claim, it is the role of the federal court

20  to determine if he has any available remaining remedies in state court. *See Ortiz*, 149 F.3d

21  at 931.  In making that decision, the court must assess the likelihood that a state court will

22  allow a determination on the merits of his claim. *See Phillips v. Woodford*, 267 F.3d 966,

23  974 (9th Cir. 2001).

24  This Court concludes that if Petitioner were to return to state court now and attempt to

25  litigate Claim 3, it would be found waived and untimely under Rules 32.2(a)(3)[4] and 32.4(a)

26  _____

27      [4]     To the extent the Court concludes throughout this Order that Petitioner does

28  not have an available remedy in state court, because claims or portions of claims would be

of the Arizona Rules of Criminal Procedure because it does not fall within an exception to preclusion. *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h).  Therefore, Claim 3 is "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy. *See Coleman*, 501 U.S. at 732, 735 n.1; *Smith v. Baldwin*, 510 F.3d 1127, 1138 (9th Cir. 2007) (en banc).  Claim 3 will not be considered on the merits absent a showing of cause and prejudice or fundamental miscarriage of justice.

As cause to excuse the procedural default, Petitioner alleges that trial counsel was ineffective for failing to present this claim in state court.  (Doc. 73 at 22-24.)  Before a claim of ineffective assistance of counsel ("IAC") may be used as cause to excuse a procedural default, it must first be exhausted in state court as an independent claim. *See Edwards v. Carpenter*, 529 U.S. 446, 451-53 (2000); *Murray v. Carrier*, 477 U.S. 478, 489-90 (1986); *Tacho v. Martinez*, 862 F.2d 1376, 1381 (9th Cir. 1988).  During PCR proceedings, Petitioner did not present this ineffectiveness allegation as an independent claim.  (*See* ROA-

---

precluded as waived and untimely pursuant to Rules 32.2(a)(3) and 32.4(a), Petitioner does not assert that any exceptions to preclusion are applicable. *See Beaty v. Stewart*, 303 F.3d 975, 987 & n.5 (9th Cir. 2002) (finding no available state court remedies and noting that petitioner did not attempt to raise any exceptions to Rule 32.2(a)).  First, Petitioner does not assert the application of any of the preclusion exceptions enumerated in Rule 32.2(b)(2), and the Court finds that none apply. *See* Ariz. R. Crim. P. 32.2(b)(2); 32.1(d)-(h).  Second, Petitioner does not argue that any of the claims are of the type that cannot be waived absent a personal knowing, voluntary, and intelligent waiver. *See, e.g., Cassett v. Stewart*, 406 F.3d 614, 622-23 (9th Cir. 2005).

       The Court concludes, as to all of the claims in this Order for which the Court determines there is no available remedy in state court, that none of those claims fall within the limited framework of claims requiring a knowing, voluntary, and intelligent waiver. *See* Ariz. R. Crim. P. 32.2(a)(3) cmt. (West 2004) (noting that most claims of trial error do not require a personal waiver); *Stewart v. Smith*, 202 Ariz. 446, 449, 46 P.3d 1067, 1070 (2002) (identifying the right to counsel, right to a jury trial, and right to a 12-person jury under the Arizona Constitution as the type of claims that require personal waiver); *see also State v. Espinosa*, 200 Ariz. 503, 505, 29 P.3d 278, 280 (App. 2001) (withdrawal of plea offer in violation of due process not a claim requiring personal waiver); *but cf. Cassett*, 406 F.3d at 622-23 (finding claim not defaulted because unclear whether personal waiver would be required under state law).

PCR 3.)  Therefore, Petitioner did not exhaust this claim, and it cannot establish cause.

Petitioner also alleges that IAC of PCR counsel provides cause to excuse the default. (Doc. 73 at 22-24.)  Petitioner contends that PCR counsel failed to present Claim 3 due to a conflict of interest because counsel's brother was a Deputy Sheriff for the La Paz County Sheriff's Department and had some involvement in the county's investigative proceedings against Petitioner, and because counsel's wife was the Clerk of the La Paz County Superior Court during the relevant time period.  (*See* Doc. 73 at 23.)  This Court has already discussed and rejected this allegation, explaining that IAC can represent sufficient cause only when it rises to the level of an independent constitutional violation; that when a petitioner has no constitutional right to counsel, there can be no constitutional violation arising out of ineffectiveness of counsel; that there is no constitutional right to counsel in state PCR proceedings; and that the Ninth Circuit has considered and rejected the argument that cause exists to overcome a procedural default where PCR counsel, due to an alleged conflict of interest, failed to assert a claim during PCR proceedings. (Doc. 87 at 9-10.)  For the same reasons, these IAC contentions do not establish cause to excuse the procedural default. Because Petitioner has failed to establish cause, there is no need to address prejudice.  *See Boyd v. Thompson*, 147 F.3d 1124, 1127 (9th Cir. 1998).

Petitioner next argues that a fundamental miscarriage of justice will occur if Claim 3 is not reviewed on the merits because he is actually innocent.  (Doc. 73 at 23-24.)  The Court also previously rejected this assertion, explaining that Petitioner has failed to provide reliable new evidence that he is factually innocent of first-degree murder.  (Doc. 87 at 11-12.) Petitioner having failed to establish grounds to excuse his procedural default, Claim 3 is procedurally barred.

**Claim 4-A**

Petitioner contends that he was denied the right to a fundamentally fair trial when the prosecutor vouched for two prosecution witnesses during closing argument.  This claim was exhausted on direct appeal and thus entitled to review on the merits.

Background

During closing argument, the prosecutor commented on Karen Thompson's testimony while discussing the evidence linking Petitioner to the crime scene:

> The sheriff's office found the glasses out at the scene, all the things described out here [sic] the shoe was found at the scene; the pool of blood next to the belt. The blood's analyzed, found to be of a type consistent with Mr. Anderson; the drag marks; the other section of the belt just as it was described by Karen; and everything that Karen said about what happened as she talked about getting off the exit is consistent again with what Hornback and Wagner saw, but getting off on that exit, going across the overpass, and she said initially they went on past there about a quarter of a mile and they stopped.
>
> *Now, she's been, I think, honest when she says she wasn't even aware that Hornback and Wagner had seen her and made these observations.*

(RT 11/18/92 at 51-52 (emphasis added).)  During rebuttal argument, the prosecutor further stated:

> Karen gave us some testimony that he was wearing those glasses that night, but my recollection of the testimony was never that he actually had those things on his face as he attacked Mr. Anderson out there.  Maybe he – maybe he did. Maybe he had them in his pocket, you know. Maybe he had them who knows where.
>                    . . . .
> Is it critical to the State's case that he had those glasses on his face as he ran over Mr. Anderson? No, it's not, but he had them on his person somewhere because he left them there, and we know he left them there.  There's no other evidence. *There's no other reasonable alternative, I believe, of how the glasses got there.*

(*Id.* at 108-10 (emphasis added).)

Regarding Gene Vernoy, the convenience store clerk who saw a man with Thompson shortly after the murder, the prosecutor argued:

> So now all of a sudden, Gene Vernoy is being put on the spot, well if the guy that was with this woman was actually taller and he goes along with that and says, "yeah, he was taller," but I think there's a couple things about Gene Vernoy that you have to keep in mind.
>
> First of all, other than they see thousands of people over time and the man could easily make an honest mistake in perception and memory about the man that was with Karen Thompson and to demonstrate that, maybe his memory was a little fuzzy in that regard.
>
> If you recall, he thought the car they were in was a – was a yellow Toyota; thought the car was a yellow Toyota. No.  That's not right; and again, this is not

1
2
3

the fault of Mr. Vernoy. *I think he was an honest man, certainly an honest man, but I think he made a honest mistake* and that was demonstrated best, I think, in – when – Mr. Lee, Darrel's father, talked to him on the phone there and Mr. Vernoy said that he thought that he, Gene Vernoy, was taller than Karen, so this is how his perception of height operates here.

4

(*Id.* at 56-57 (emphasis added).)

5
6
7

Defense counsel did not object to any of these comments at trial. Accordingly, the Arizona Supreme Court on appeal reviewed Petitioner's vouching contentions only for fundamental error:

8
9
10
11
12
13
14

It is impermissible for a prosecutor to place the prestige of the government behind his witness or suggest that information not presented to the jury supports a witness's testimony. That did not occur here. The prosecutor essentially conceded that Thompson and Vernoy had been mistaken in parts of their testimony (regarding the presence of another car in the area, and the size of the man seen with the woman). Moreover, the remark pertaining to defendant's glasses was more about the physical evidence at the scene than about Thompson's testimony. Defendant had maintained that the glasses were found in a position that would be unexpected if they had fallen off while being worn. The prosecutor's argument, read in context, was that even though Thompson might have been wrong when she said defendant had his glasses on during the struggle, the fact that they were found at the location made it immaterial whether they fell off his face or out of his pocket.

15
16
17

. . . The evidence supporting Karen Thompson's story was compelling. The prosecution corroborated different parts of it with at least five independent witnesses. Moreover, Thompson was willing to implicate herself as the more active participant in the events that took place.

18
19
20
21
22

Even apart from Thompson's testimony, however, there was evidence that defendant was with her a few days before the killing, a few minutes before the victim disappeared from the medical center, and a few hours after his death; that Thompson was accompanied by a man less than an hour after the murder and by someone in the car with her minutes before it; that defendant had possession of the victim's car days later; and that defendant's prescription glasses, which he claimed to have lost on or about December 2, were seen on his face December 5, minutes before the victim disappeared, and were found by police at the scene of the homicide.

23
24

Vernoy's testimony was relatively tangential and served only to place Thompson with a man, perhaps taller than she, possibly mustached, and maybe Hispanic, in California shortly after the murder. The prosecutor's comments about it were insignificant.

25

*Lee*, 185 Ariz. at 554, 917 P.2d at 697 (citation omitted).

26

Discussion

27
28

Federal habeas review for a claim of prosecutorial misconduct is "the narrow one of due

- 14 -

process, and not the broad exercise of supervisory power." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. at 642). In order to obtain relief, Petitioner must prove not only that the prosecutor's remarks and other conduct were improper but that they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Id.*; *see also Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (habeas relief is limited to cases in which the petitioner can establish that prosecutorial misconduct resulted in actual prejudice); *Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("The touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor.").

In determining if a defendant's due process rights were violated by a prosecutor's remarks during closing argument, a reviewing court "must consider the probable effect [of] the prosecutor's [comments] on the jury's ability to judge the evidence fairly." *United States v. Young*, 470 U.S. 1, 12 (1985). To make such an assessment, it is necessary to place the prosecutor's remarks in context. *See Boyde v. California*, 494 U.S. 370, 385 (1990); *United States v. Robinson*, 485 U.S. 25, 33-34 (1988); *Williams v. Borg*, 139 F.3d 737, 745 (9th Cir. 1998). In *Darden*, for example, the Court assessed the fairness of the trial by considering, among other circumstances, whether the prosecutor's comments manipulated or misstated the evidence; whether the trial court gave a curative instruction; and the weight of the evidence against the accused. 477 U.S. at 181-82.

As a general rule, a prosecutor may not vouch for the credibility of a witness. *See Young*, 470 U.S. at 18-19; *Lawn v. United States*, 355 U.S. 339, 359-60 n.15 (1958); *Berger v. United States*, 295 U.S. 78, 86-88 (1935). "Vouching consists of placing the prestige of the government behind a witness through personal assurances of the witness's veracity, or suggesting that information not presented to the jury supports the witness's testimony." *United States v. Necoechea*, 986 F.2d 1273, 1276 (9th Cir. 1993) (citing *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980)). Vouching constitutes misconduct because it may lead the jury to convict on the basis of evidence not presented; it also carries the

1    imprimatur of the government, which may induce the jury to adopt the government's

2    judgment rather than its own.  *See Young*, 470 U.S. at 18.

3        Based on an assessment of the relevant factors considered in *Darden*, the Court

4    concludes that the prosecutor's comments taken together did not so infect the trial as to

5    render it fundamentally unfair.  First, the comments did not manipulate or misstate the

6    evidence presented at trial.  Thompson testified that due to the amount of cocaine she had

7    used that night she didn't recall seeing another vehicle approach as they exited the freeway.

8    The prosecutor's comment did not vouch for Thompson's testimony, but explained that, in

9    light of her intoxicated state, it was a distinct possibility she did not see the other vehicle.

10   Nor did the prosecutor vouch when stating that he "believed" Thompson's testimony about

11   Petitioner's prescription sunglasses.  Rather, he referred to the lack of any other explanation

12   for how the glasses could have been found at the scene.  The prosecutor's comment about

13   Vernoy being an honest man who may have made an honest mistake also did not constitute

14   vouching, but suggested an explanation as to how the witness may have made a mistake

15   regarding the height of the man he saw with Thompson, just as he had made a mistake about

16   the type of car the individuals were driving.  Overall, none of these comments misstated or

17   manipulated the evidence presented at trial.  Instead, the prosecutor "argue[d] reasonable

18   inferences based on the evidence[.]"  *Necoechea*, 986 F.2d at 1276.

19       Second, the lack of a curative instruction did not infect the trial because Petitioner failed

20   to object or request such an instruction.  The trial court instructed the jurors that what the

21   lawyers said in argument was not evidence and that the jurors had to determine the facts only

22   from the evidence.  (RT 11/18/92 at 11-12; *see also id.* at 25.)  The jury is presumed to

23   follow the court's instructions.  *See Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Cook v.

24   LaMarque*, 593 F.3d 810, 828 (9th Cir. 2010).

25       Third, Petitioner had an opportunity to rebut the prosecutor's comments.  (RT 11/18/92

26   at 65-96.)  Defense counsel argued that Thompson's testimony lacked credibility and that the

27   man with Thompson was taller than Petitioner.  (*Id.* at 65-72, 87-90.)

28

Finally, the evidence of Petitioner's guilt was substantial.  Petitioner admitted being with Thompson on the day of the crimes when they attempted to gain entrance to the home of an individual named Leza McCurty, who lived near the location where the kidnapping took place.  (RT 11/17/92 at 132-34, 166.)  McCurty said this occurred around noon, positively identified Thompson, and said the man accompanying her wore sunglasses.  (RT 11/13/92 at 134-36.)  Thompson testified that around noon that same day she and Petitioner were looking for someone to rob and that the victim agreed to give them a ride.  (RT 11/17/92 at 23-24; RT 11/13/92 at 35-36.)  Thompson also testified that after the victim attempted to escape, Petitioner chased him down, tried to strangle him with a belt, and then held him down while Thompson killed him with a rock.  (*Id.*)  Subsequently, Petitioner's prescription sunglasses were found at the crime scene.  (RT 11/12/92 at 179; RT 11/17/92 at 167-68.)  Petitioner also admitted that he was with Thompson as they traveled throughout Southern California using the victim's credit cards.  (RT 11/17/92 at 138-42.)  Thus, the strength of the evidence against Petitioner supports a determination that he was not prejudiced by the prosecutor's remarks.

Petitioner has not established prosecutorial misconduct.  The Arizona Supreme Court's rejection of this claim was not contrary to or based on an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts.

**Claim 5-A**

At the presentencing aggravation/mitigation hearing, the prosecutor submitted evidence and argument in support of several alleged aggravating factors.  (*See* RT 2/10/93.)  One month later, at the sentencing hearing, the prosecutor asserted that although the evidence supported his alleged aggravating factors, it was his personal opinion that Petitioner should be imprisoned for life and not given the death penalty.  (RT 3/8/93 at 13-15.)  He also acknowledged that under the law the sentencing decision was in the judge's hands.  (*Id.* at 12.)  After a recess, the court determined that the prosecutor's recommendation constituted a mitigating factor but that the proven mitigation nonetheless was insufficient to outweigh

- 17 -

the aggravation.  (*Id.* at 22, 31.)

Petitioner contends that pursuant to *Lankford v. Idaho*, 500 U.S. 110 (1991), his due process rights were violated when the court imposed a capital sentence after the prosecutor essentially withdrew his intent to seek the death penalty.  (Doc. 52 at 59-65.)  He raised the claim on appeal, and the Arizona Supreme Court ruled as follows:

> The court properly considered the state's recommendation for life as a mitigating factor, but we cannot say it erred in nevertheless imposing the death sentence.  Although prosecutorial discretion to seek the death penalty extends into the sentencing phase, it "ends in a capital case with the prosecutor's decision to present or ignore evidence of aggravation."  *State v. Brewer*, 170 Ariz. 486, 499, 826 P.2d 783, 796, *cert. denied*, 506 U.S. 872, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992).  In *Brewer*, we held that the prosecutor was bound by his presentation of aggravating evidence after recommending a life sentence, even though he later asserted that he did so only because he believed it was required under law.  *Id.* at 500, 826 P.2d at 797.  Here, not only did the prosecutor present evidence in aggravation, he reasserted that those factors were present even while making his recommendation for leniency.  Moreover, as the prosecutor conceded, the trial judge still had the ultimate responsibility to decide the sentence.

*Lee*, 185 Ariz. at 556-57, 917 P.2d at 699-700.

In *Lankford*, the prosecutor notified the defense after the guilty verdict that it would not pursue the death penalty and in fact did not present argument in support of death at the sentencing hearing.  500 U.S. at 111, 116.  Consequently, defense counsel made no argument in opposition to the death penalty, and the defendant ultimately was sentenced to death.  *Id.* at 116.  In reversing, the Supreme Court reiterated that a trial judge's power to impose a sentence authorized by statute is not limited by what a prosecutor recommends, but found that a due process violation occurred because Lankford had insufficient notice that the trial court still considered the death penalty to be a viable sentencing option.  *Id.* at 119, 127.

In Petitioner's case, there was no such lack of notice.  Prior to trial, the prosecutor filed a notice of intent to seek the death penalty.  (ROA 17.)  After the guilty verdict, the prosecutor did not withdraw its intention to seek death, as in *Lankford*; rather, he presented evidence and argument in support of the alleged statutory aggravating circumstances.  (ROA 95; RT 2/10/93.)  Because Petitioner had continuing notice of the prosecution's intent to seek the death penalty, at the aggravation/mitigation hearing the defense presented evidence of

1    mitigation and argued against imposition of the death penalty.  (Doc. 90-2 at 9-23; RT

2    2/10/93.)  At the subsequent sentencing hearing, the prosecutor recommended leniency but

3    acknowledged that it was within the court's discretion to sentence Petitioner to death.

4    Because Petitioner had sufficient notice of the possibility of the death penalty, the Arizona

5    Supreme Court's denial of this claim was neither contrary to nor an unreasonable application

6    of *Lankford*, and was not based on an unreasonable determination of the facts.

7    **Claim 5-C**

8        Petitioner challenges the constitutionality and application of A.R.S. §13-703(F)(5),

9    which provides that it is an aggravating factor when "[t]he defendant committed the offense

10   as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary

11   value."  Petitioner argues that this factor is vague, overbroad, and arbitrarily applied. (Doc.

12   52 at 68-71.)  He further contends that no reasonable fact finder would have concluded that

13   the factor was established by the evidence presented at trial.  (*Id.*)

14       On direct appeal, Petitioner only challenged the application of the pecuniary gain

15   aggravating circumstance to the facts of his case; he did not raise a facial challenge.  (*See*

16   Appellant's Opening Br. at 52-53.)  The Court concludes that if Petitioner were to return to

17   state court now and attempt to litigate a facial challenge, the claim would be found waived

18   and untimely under Rules 32.2(a)(3) and 32.4(a) because it does not fall within an exception

19   to preclusion.  *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h).  Therefore, this aspect of Claim 5-C

20   is "technically" exhausted but procedurally defaulted because Petitioner no longer has an

21   available state remedy.  *See Smith*, 510 F.3d at 1138.  Petitioner fails to present any cause and

22   prejudice or fundamental miscarriage arguments to excuse the default.  Therefore, this aspect

23   of Claim 5-C is procedurally barred.

24       The remainder of the claim consists of Petitioner's challenge to the application of the

25   pecuniary gain aggravating circumstance.  This challenge fails.

26       Whether a state court correctly applied an aggravating factor to the facts is a question

27   of state law.  *See Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).  Federal habeas review is

28

limited to determining whether the state court's finding was so arbitrary or capricious as to constitute an independent due process or Eighth Amendment violation. *Id.* A state court's finding of an aggravating factor is arbitrary or capricious only if no reasonable sentencer could have reached the same conclusion. *Id.* at 783. In reviewing the sufficiency of the evidence under this "rational factfinder" standard, the question is "whether after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact" could have made the finding beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). A habeas court faced with a record of historical facts which supports conflicting inferences must presume (even if it does not appear in the record) that the trier of fact resolved any such conflicts in favor of the prosecution. *Id.* at 326.

At sentencing, the trial court concluded that sufficient evidence had been submitted to establish the pecuniary gain factor beyond a reasonable doubt. The trial court found that the victim had been kidnapped to obtain money for the purchase of drugs, that robbery and thefts were committed against the victim after the kidnapping, that the victim was murdered in furtherance of the robbery and thefts, and that he was killed to facilitate Petitioner's escape and to hinder detection and apprehension. (RT 3/8/93 at 25.) The state supreme court agreed, concluding that the "murder was committed to hinder detection so that Petitioner and Thompson could continue their use of the car and credit cards." *Lee*, 185 Ariz. at 558, 917 P.2d at 701.

"[A] finding that a murder was motivated by pecuniary gain for purposes of § 13-703(F)(5) must be supported by evidence that the pecuniary gain was the impetus of the murder, not merely the result of the murder." *Moormann v. Schriro*, 426 F.3d 1044, 1054 (9th 2005). "[K]illing the victim and sole witness of a robbery is powerful circumstantial evidence of an intent to facilitate escape or hinder detection and thus advance the underlying pecuniary gain objective." *State v. Canez*, 202 Ariz. 133, 159, 42 P.3d 564, 590 (2002); *see also State v. Hoskins*, 199 Ariz. 127, 147, 14 P.3d 997, 1017 (2000) ("When a robbery victim is executed to facilitate the killer's escape and hinder detection for the purpose of

1    successfully procuring something of value, the pecuniary gain motive is present.").

2        Based upon the facts proven at trial, this Court easily concludes that a rational factfinder

3    could have determined that the offense was motivated by the desire for pecuniary gain, that

4    the objective was to rob the victim, and that the killing occurred in furtherance of the

5    robbery, to facilitate escape, and to hinder detection. *See Correll v. Stewart*, 137 F.3d 1404,

6    1420 (9th Cir. 1998); *Woratzeck v. Stewart*, 97 F.3d 329, 336 (9th Cir. 1996); *State v.*

7    *LaGrand*, 153 Ariz. 21, 35, 734 P.2d 563, 577 (1987) ("When the defendant comes to rob,

8    the defendant expects pecuniary gain and this desire infects all other conduct of the

9    defendant."). The Arizona Supreme Court's rejection of this claim was not contrary to or

10   based on an unreasonable application of clearly established federal law; nor was it based on

11   an unreasonable determination of the facts.

12   **Claim 5-D**

13       Petitioner contends that the trial court erred in concluding that certain mitigation

14   evidence, both statutory and non-statutory, had not been established by a preponderance of

15   the evidence at sentencing. (Doc. 52 at 71-79.) As a result, according to Petitioner, the court

16   failed to properly consider his proffered mitigation evidence in violation of *Lockett v. Ohio*,

17   438 U.S. 586 (1978). Respondents concede that Petitioner exhausted this issue on direct

18   appeal. (Doc. 68 at 71.)

19       In a capital sentencing proceeding, the sentencer must not be precluded, whether by

20   statute, case law, or any other legal barrier, from considering constitutionally relevant

21   mitigating evidence. *See Lockett*, 438 U.S. at 604; *see also Eddings v. Oklahoma*, 455 U.S.

22   104, 113-14 (1982). Constitutionally relevant mitigating evidence consists of "any aspect

23   of a defendant's character or record and any of the circumstances of the offense that the

24   defendant proffers as a basis for a sentence less than death." *Lockett*, 438 U.S. at 604.

25   However, while the sentencer must not be foreclosed from considering relevant mitigating

26   information, the Constitution does not require that a capital sentencer be instructed in how

27   to weigh any particular fact in the capital sentencing decision. *See Tuilaepa v. California*,

28

- 21 -

1   512 U.S. 967, 979 (1994).

2       Even though a claim that the trial court failed to consider relevant mitigation evidence

3   implicates federal constitutional concerns, a claim that the trial court wrongly determined that

4   mitigation has not been proven presents a question of state law.  *See Walton v. Arizona*, 497

5   U.S. 639, 649 (1990), *overruled on other grounds by Ring v. Arizona,* 536 U.S. 584 (2002)

6   ("it does not follow from *Lockett* and its progeny that a State is precluded from specifying

7   how mitigating circumstances are to be proved"); *cf. Lewis v. Jeffers*, 497 U.S. at 780.  In

8   *Walton*, the Court rejected the argument that A.R.S. § 13-703(C) is unconstitutional because

9   it requires a defendant to prove mitigating circumstances by a preponderance of the evidence.

10  497 U.S. at 650; *see also Delo v. Lashley*, 507 U.S. 272, 275-76 (1993) (referring to *Walton*

11  and stating that the Court had "made clear that a State may require the defendant to bear the

12  risk of nonpersuasion as to the existence of mitigating circumstances") (internal quotation

13  and citation omitted).

14      On habeas review, a federal court does not evaluate the substance of each piece of

15  evidence submitted as mitigation; rather, it reviews the state court record to ensure that the

16  state court allowed the presentation of and considered all relevant mitigating information.

17  *See Blystone v. Pennsylvania*, 494 U.S. 299, 307 (1990) (the requirement of individualized

18  sentencing in capital cases is satisfied by allowing the sentencer to consider all relevant

19  mitigating evidence); *Jeffers v. Lewis*, 38 F.3d 411, 418 (9th Cir. 1994) (en banc).  "[T]he

20  trial court need not exhaustively analyze each mitigating factor 'as long as a reviewing

21  federal court can discern from the record that the state court did indeed consider all

22  mitigating evidence offered by the defendant.'" *Moormann*, 426 F.3d at 1055 (quoting *Clark

23  v. Ricketts*, 958 F.2d 851, 858 (9th Cir. 1991)); *see also Parker v. Dugger*, 498 U.S. 308,

24  314-15, 318 (1991) (sentencing court properly considered all mitigation, including

25  nonstatutory mitigation, where the court stated that it considered all the evidence and found

26  no mitigating circumstances that outweighed the aggravating circumstances); *Lopez v.

27  Schriro,* 491 F.3d 1029, 1037 (9th Cir. 2007) (rejecting a claim that the sentencing court

28

- 22 -

failed to consider proffered mitigation where the court did not prevent the defendant from presenting any evidence in mitigation, did not affirmatively indicate there was any evidence it would not consider, and expressly stated it had considered all mitigation evidence proffered by the defendant); *Gerlaugh v. Stewart*, 129 F.3d 1027, 1044 (9th Cir. 1997). The determination of what the trial judge found as a mitigating circumstance is an issue of historical fact. *Parker*, 498 U.S. at 320; *Lopez*, 491 F.3d at 1038.

In Arizona, sentencing courts have been instructed that if relevant mitigating information does not rise to the level of a statutory mitigating circumstance, it must nonetheless be considered as nonstatutory mitigation in order to determine whether the defendant should be treated with leniency. *See State v. McMurtrey*, 136 Ariz. 93, 102, 664 P.2d 637, 646 (1983).

Petitioner asserts that the trial court erred in concluding that he had failed to establish statutory mitigation under A.R.S. §§ 13-703(G)(1), (G)(3), (G)(4)[5] and the nonstatutory mitigating circumstances of organic brain syndrome, amenability to rehabilitation, and the giving of a felony murder instruction. (Doc. 52 at 71-79.) Regarding the (G)(1) factor,

---

[5]      In 1991, A.R.S. § 13-703(G), provided, in relevant part, that mitigating factors include the following:

> 1. The defendant's capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law was significantly impaired, but not so impaired as to constitute a defense to prosecution. . . .

> 3. The defendant was legally accountable for the conduct of another under the provisions of § 13-303, but his participation was relatively minor, although not so minor as to constitute a defense to prosecution.

> 4. The defendant could not reasonably have foreseen that his conduct in the course of the commission of the offense for which the defendant was convicted would cause, or would create a grave risk of causing, death to another person.

A.R.S. § 13-703(G) (West 1991).

1   Petitioner contends that his cocaine and alcohol intoxication at the time of the crime
2   combined with his pre-existing organic brain syndrome rendered him unable to conform his
3   conduct to the requirements of law.  (Doc. 52 at 72-73.)  At sentencing, he submitted the
4   report of a psychiatrist, Dr. Leonardo Garcia-Buñuel, whose findings Petitioner contends
5   were uncontroverted.  (RT 2/10/93; Doc. 90-2 at 28-35.)  For (G)(3), Petitioner argues that
6   the trial court erred in failing to conclude he was a minor participant because it was
7   Thompson who killed the victim and was the major player in the underlying felonies while
8   he was only an accomplice.  (Doc. 52 at 73-74.)  Regarding (G)(4), Petitioner contends that
9   the judge erred in concluding that he could reasonably foresee that his conduct would cause,
10  or create a grave risk of causing, death to another person.  (*Id.* at 74-75.)  Petitioner relies on
11  the report of Dr. Garcia-Buñuel to prove that he did not reasonably foresee or intend the
12  victim's death.  Finally, as to nonstatutory mitigation, Petitioner contends that the trial court
13  erred in rejecting his evidence of organic brain syndrome, amenability to rehabilitation, and
14  the giving of a felony murder instruction.  (Doc. 52 at 75-76.)  Petitioner again relies on Dr.
15  Garcia-Buñuel's report to establish proof of these factors.

16      Review of the sentencing record shows that the trial court considered all of Petitioner's
17  mitigation evidence.   The trial court concluded that Dr. Garcia-Buñuel's report was
18  insufficient to establish the (G)(1) circumstance because Petitioner's actions

19      indicate he was able to appreciate the wrongfulness of his conduct and had the
20      ability to conform his conduct to the law.  Just prior to the killing the defendant
        attempted unsuccessfully to poison the victim with automobile exhaust.  The
21      defendant took quick action to thwart the victim's escape.  The defendant returned
        the victim's body to the trunk in order to remove it from the scene and hinder
22      detection.

23  (ROA 99 at 5.)  The court also discounted the report because it was not corroborated by any
24  psychological testing and was based entirely on Petitioner's self-report.  (*Id.* at 5-6.)  The
25  Arizona Supreme Court also considered Dr. Garcia-Buñuel's report and upheld the trial
26  court's conclusion that the (G)(1) circumstance had not been proven.  *Lee*, 185 Ariz. at 560,
27  917 P.2d at 701.

28

Regarding the (G)(3) and (G)(4) factors, the trial court considered the evidence submitted by Petitioner but concluded that neither statutory circumstance had been established. The court found that Petitioner's conduct was not minor and that it was foreseeable his conduct would result in the victim's death. (ROA 99 at 6.) The court reasoned that it was Petitioner's threats of harm to the victim that caused the victim to submit to the kidnapping, robbery, and thefts. (*Id.*) The court also found:

> The defendant attempted unsuccessfully to kill the victim with exhaust fumes. The defendant recaptured the victim when he tried to escape, attempted to strangle the victim with a belt, held the victim while Karen Thompson struck the fatal blow and attempted to strangle the victim with his hands after the blow was struck. The defendant intended to kill the victim.

(*Id.*) The Arizona Supreme Court agreed, concluding that overwhelming evidence showed that Petitioner was not a minor participant and had not established lack of foreseeability of the victim's death. *Lee*, 185 Ariz. at 560, 917 P.2d at 701.

Regarding nonstatutory mitigation, the trial court considered but rejected Petitioner's evidence of a behavior disorder based on Dr. Garcia-Buñuel's opinion regarding organic brain syndrome. (ROA 99 at 7.) The court also considered but rejected Dr. Garcia-Buñuel's opinion that Petitioner might be rehabilitated in prison. (*Id.*) The court concluded that Petitioner's "past history of substance abuse and criminal activities make it likely that he would commit further criminal acts if allowed." (*Id.*)

The state supreme court considered Petitioner's proffered nonstatutory mitigating circumstances but rejected them as not having been proven by a preponderance of the evidence. *Lee*, 185 Ariz. at 560, 917 P.2d at 701. Regarding the trial court's alleged failure to sufficiently consider the felony-murder instruction as mitigation, the court held that "[s]uch an instruction may be considered mitigating only when there is some doubt as to whether the defendant intended to kill the victim. There is no reasonable doubt here that defendant intended Anderson's death. He planned it, discussed it and participated in its execution." *Id.* (citation omitted).

Applying the rule of *Lockett* and its progeny, it is clear that the sentencing court

- 25 -

considered and evaluated all of the evidence proffered in mitigation but found it wanting as a matter of fact, not as a matter of law.  *See Eddings*, 455 U.S. at 113; *Blystone*, 494 U.S. at 307 (sentencer is not required to find proffered evidence mitigating).  The trial court was not precluded from considering, and did in fact consider, the evidence submitted by Petitioner in support of the statutory and nonstatutory mitigating circumstances.  Thus, the evidence was not placed "beyond the effective reach of the sentencer."  *Graham v. Collins*, 506 U.S. 461, 475 (1993).  The Arizona Supreme Court's rejection of this claim was neither contrary to nor an unreasonable application of controlling federal law.

**Claim 5-E**

Pursuant to *Enmund v. Florida*, 458 U.S. 782, 797 (1982), and *Tison v. Arizona*, 481 U.S. 137, 158 (1987), Petitioner contends that his death sentence for felony murder violates the Eighth Amendment because the trial court did not make a sufficient *Enmund/Tison* finding and because the Arizona Supreme Court unreasonably determined the facts in reviewing this issue.  (Doc. 52 at 79-93.)

A defendant convicted of felony murder can be sentenced to death only if he actually killed, attempted to kill, or intended to kill, or if he was a major participant in the underlying felony and acted with reckless indifference to human life.  *Tison*, 481 U.S. at 157-58; *Enmund*, 458 U.S. at 797.  In Arizona, first-degree murder is a single crime, whether it occurs as a premeditated murder or a felony murder.  *See Schad v. Arizona*, 501 U.S. 624, 644-45 (1991) (concluding that Arizona's definition of first-degree murder was not unconstitutional).  Petitioner's jury returned a general verdict on his first-degree murder charge.  (ROA 74.)  Because it is possible that Petitioner's jury only found him guilty of felony murder, an *Enmund/Tison* finding at sentencing was necessary.

An *Enmund/Tison* finding may be made either at the trial level or at the appellate level. *See Cabana v. Bullock*, 474 U.S. 376, 387-88 (1986), *overruled in part on other grounds, Pope v. Illinois*, 481 U.S. 497, 503 n.7 (1987) ("The court must examine the entire course of the state court proceedings against the defendant in order to determine whether, at some point

- 26 -

in the process, the requisite factual finding as to the defendant's culpability has been made."). A state court's finding that *Enmund/Tison* is satisfied is sufficient if "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact" could have made the finding beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319. On habeas review, the provisions of the AEDPA demand an additional level of deference for state court findings. *See* 28 U.S.C. § 2254(e)(1) (petitioner bears the burden of overcoming by "clear and convincing evidence" the presumption of correctness applicable to a state court's factual determinations). A state court's findings regarding *Enmund/Tison* are factual determinations that are presumed correct and for which Petitioner "bear[s] the heavy burden of overcoming." *Cabana*, 474 U.S. at 377-78.

In its special verdict, the trial court explained its conclusion that Petitioner intended to kill the victim:

> The defendant's threats of harm to the victim caused the victim to submit to the kidnap, robbery, and thefts. The defendant attempted unsuccessfully to kill the victim with exhaust fumes. The defendant recaptured the victim when he tried to escape, attempted to strangle the victim with a belt, held the victim while Thompson struck the fatal blow and attempted to strangle the victim with his hands after the blow was struck. The defendant intended to kill the victim.

(ROA 99 at 6.) On direct appeal, the Arizona Supreme Court ruled:

> In the same vein, defendant argues that the trial court erred in failing to make a specific finding pursuant to *Enmund v. Florida*, 458 U.S. 782, 801, 102 S.Ct. 3368, 3378-79, 73 L.Ed.2d 1140 (1982), that he killed, intended to kill, or attempted to kill the victim. The jury returned a general form of first degree murder verdict, without indicating whether it found premeditated murder, felony-murder, or accomplice liability. However, the trial court specifically found, in that part of its special verdict concerning statutory mitigating circumstances, that "[t]he defendant intended to kill the victim." Although the court did not state that this finding was made beyond a reasonable doubt, the record clearly supports such a conclusion.
>
> When a jury is instructed on felony-murder and finds the defendant guilty of first degree murder, the trial court must make an *Enmund* finding of the requisite degree of culpability beyond a reasonable doubt. *State v. McDaniel*, 136 Ariz. 188, 199, 665 P.2d 70, 81 (1983). However, we have accepted *Enmund* findings that were not specifically labeled as having been made "beyond a reasonable doubt." *See State v. McCall*, 160 Ariz. 119, 126, 770 P.2d 1165, 1172 (1989), *cert. denied*, 497 U.S. 1031, 110 S.Ct. 3289, 111 L.Ed.2d 798 (1990) (finding of intent to kill sufficient when made in the context of rejecting a proffered mitigating factor); *Martinez-Villareal*, 145 Ariz. at 450, 702 P.2d at 679 (finding of intent to

kill in sentencing met required degree of proof where independent review of record supported a finding of beyond a reasonable doubt). Form will not be permitted to triumph over substance. There is no magic in the words used so long as it is apparent that the trial court has applied a correct standard.

Here, the court cited defendant's admission of involvement in the killing to a defense expert retained for mitigation purposes, the evidence of his attempts to kill the victim by asphyxiation and manual strangulation, the fact that he held the victim down for Karen Thompson's fatal blow, and his admission to the psychiatrist that he could have stopped Thompson from killing the victim but did not. This evidence, coupled with all of the testimony about the planning of the crime, supports a finding beyond a reasonable doubt that defendant intended to kill the victim.

*Lee*, 185 Ariz. at 559, 917 P.2d at 702.

Petitioner first claims that the trial court failed to make a sufficient *Enmund/Tison* factual finding. (Doc. 52 at 79-85.) Although Petitioner acknowledges the trial court's conclusion that he intended the death of the victim, he argues that intent was not found beyond a reasonable doubt as required. (*Id.*) He further argues lack of intent due to his alcohol/cocaine intoxication on the night of the crime, as well as his alleged organic brain syndrome. (*Id.*) Finally, Petitioner argues that the *Tison* factors were not established because he was a minor participant who only aided and abetted Thompson in the underlying kidnapping and robbery. (*Id.*)

A reviewing court does not reweigh the evidence; rather, the inquiry is whether any rational trier-of-fact could have found, beyond a reasonable doubt, that the *Enmund/Tison* prerequisite was met. *See Jackson*, 443 U.S. at 319. Based on the evidence submitted at trial and Petitioner's concession at sentencing that he aided and abetted the murder (Doc. 90-2 at 28-35), any rational trier of fact could have found that Petitioner intended the victim's death because he participated in trying to kill the victim with exhaust fumes, subsequently tackled him, tried to strangle him with a belt, and held him down when Thompson killed him with a rock. *See Tison*, 481 U.S. at 150 ("Traditionally, 'one intends certain consequences when he desires that his acts cause those consequences or knows that those consequences are substantially certain to result from his acts.'") (quoting W. LaFave & A. Scott, *Criminal Law* § 28, p. 196 (1972)). Furthermore, regarding alcohol and cocaine impairment, Petitioner

specifically told Dr. Garcia-Buñuel that he had a good recollection of the events leading up to and including the murder, acknowledging that he tackled the victim and held him down while Thompson killed him with a rock.  (Doc. 90-2 at 28-35.)  Such a concession clearly satisfies the *Tison* factors of being a major participant in the murder and having a reckless disregard for human life.  *See Paradis v. Arave*, 20 F.3d 950, 959-60 (9th Cir. 1994) (confession to aiding and abetting murder satisfies the *Tison* standard of culpability).

Petitioner also argues that the state supreme court unreasonably determined the facts in support of its *Enmund/Tison* finding.  However, that court's citation of the factual record clearly supports its conclusion that Petitioner intended to kill the victim, was a major participant in the murder and underlying felonies, and exhibited a reckless disregard for human life.  *See Lee*, 185 Ariz. at 559, 917 P.2d at 702.  Although Petitioner advances a contrary view of the evidence, this Court reviews the evidence in the light most favorable to the prosecution.  *See Jackson*, 443 U.S. at 319.  The Arizona Supreme Court's rejection of this claim was not contrary to or based on an unreasonable application of clearly established federal law or based on an unreasonable determination of the facts.

**Claim 7**

Petitioner alleges that he was denied his constitutional right to a fair trial and sentencing hearing before an impartial trial judge because the judge was biased against him.  (Doc. 52 at 95-98.)  Petitioner concedes that he failed to present this claim in state court.  (*Id.* at 97.)  However, he contends, without explanation or argument, that a claim of judicial bias is excused from the exhaustion requirement because judicial bias constitutes structural error. (Doc. 73 at 28.)  The Court disagrees.

In *Smith v. Baldwin* the Ninth Circuit held that the petitioner's excuses for failing to exhaust a claim were irrelevant, stating that "Smith needs no excuse from the exhaustion requirement because he has technically exhausted his state remedies through his procedural default. . . . [T]he relevant question becomes whether Smith's procedural default can be excused, not whether Smith's failure to exhaust can be excused."  510 F.3d at 1139.

- 29 -

1   Moreover, the AEDPA specifically provides that a writ of habeas corpus may not be granted

2   unless it appears that a petitioner has exhausted all available state court remedies.  *See* 28

3   U.S.C. § 2254(b)(1)(A); *see also Rhines v. Weber*, 544 U.S. 269, 276 (2005) (stating that

4   claims must first be exhausted in state court); *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981)

5   ("It has been settled for nearly a century that a state prisoner must normally exhaust available

6   state remedies before a writ of habeas corpus can be granted by the federal courts.").

7   Petitioner had the opportunity to raise Claim 7 on direct appeal but failed to do so.  Petitioner

8   does not assert cause and prejudice or allege a fundamental miscarriage of justice to excuse

9   the default.  Therefore, Claim 7 is procedurally barred.

10   **Claim 8-A**

11   Petitioner contends that Arizona's death penalty statute violates the Equal Protection

12   Clause of the Fourteenth Amendment because if the evidence in mitigation and aggravation

13   is equally balanced, a defendant receives the aggravated sentence of death under the first-

14   degree murder statute but only the presumptive, not aggravated, sentence under other

15   criminal statutes such as second-degree murder.  (Doc. 52 at 98-100.)  He also argues that

16   he is entitled to "strict scrutiny" review of these legislative classifications because "life" is

17   a fundamental right.  (*Id.*)

18   Although Respondents contest exhaustion (Doc. 68 at 81), Petitioner fairly presented

19   this issue on direct appeal (Appellant's Opening Br. at 69-72).  The Arizona Supreme Court

20   "saw no need to address this argument" because it disagreed that the aggravating and

21   mitigating evidence in this case was "in balance."  *Lee*, 185 Ariz. at 553, 917 P.2d at 696.

22   "The threshold question under AEDPA [is] whether [the petitioner] seeks to apply a rule

23   of law that was clearly established at the time his state-court conviction became final[.]"

24   *Williams v. Taylor*, 529 U.S. at 390.  Habeas relief cannot be granted if the Supreme Court

25   has not "broken sufficient legal ground" on a constitutional principle advanced by a

26   petitioner. *Williams*, 529 U.S. at 381; *see Carey v. Musladin*, 549 U.S. 70, 77 (2006).  Thus,

27   Petitioner must establish that the state court's decision is contrary to controlling Supreme

28

1   Court precedent.  *See Musladin*, 549 U.S. at 74; *see also Plumlee v. Masto*, 512 F.3d 1204,

2   1211 (9th Cir. 2008) (en banc) (requiring petitioner to carry burden of citing applicable

3   Supreme Court precedent in support of claim).

4          Here, Petitioner cites no Supreme Court case supporting his equal protection argument,

5   and the Court has found none.  Nor does he assert that the Arizona Supreme Court

6   unreasonably found that the aggravating and mitigating evidence in this case was not equally

7   balanced.  Accordingly, the Court cannot find that the Arizona Supreme Court's rejection of

8   this claim was either contrary to or an unreasonable application of controlling federal law,

9   or that it was based on an objectively unreasonable determination of the facts.

10   **Claim 8-B**

11          Petitioner contends that certain statutory aggravating circumstances established at his

12   sentencing – A.R.S. §§ 13-703(F)(2) (prior crime of violence) and (F)(6) (especially cruel,

13   heinous and depraved murder) – are unconstitutionally vague and their application to him

14   violates the Eighth and Fourteenth Amendments.  (Doc. 52 at 100-07.)  The Court previously

15   considered and denied on the merits the (F)(2) challenge in its September 2006 order (Doc.

16   87 at 23-28) and addresses here only the (F)(6) claim.

17          The (F)(6) aggravating factor may be established by either a finding of especial cruelty

18   or a finding that the murder was committed in an especially heinous or depraved manner.

19   *See State v. Beaty*, 158 Ariz. 232, 242, 762 P.2d 519, 529 (1988).  The Arizona Supreme

20   Court has construed the cruelty and heinous/depraved prongs under limiting definitions found

21   constitutional by the United States Supreme Court.  (Doc. 52 at 103.)  Petitioner contends,

22   however, that the Arizona courts have subsequently construed both the cruelty and

23   heinous/depraved prongs too broadly and thus the factors no longer constitutionally narrow

24   the class of persons eligible for the death penalty.  (Doc. 52 at 103-07.)

25          The Arizona Supreme Court has clarified that especial cruelty is established when the

26   victim consciously suffers physical pain or emotional distress.  *State v. Bible*, 175 Ariz. 549,

27   604, 858 P.2d 1152, 1207 (1993).  To establish that a murder was committed in a "heinous

28

or depraved" manner, the sentencer considers several factors, including: (1) whether the defendant relished the murder, (2) whether the defendant inflicted gratuitous violence on the victim, (3) whether the defendant mutilated the victim, (4) the senselessness of the crime, and (5) the helplessness of the victim. *State v. Gretzler*, 135 Ariz. 42, 52, 659 P.2d 1, 11 (1983). As Petitioner acknowledges, these limiting constructions were upheld in *Walton*, 497 U.S. at 654. *See also Jeffers*, 497 U.S. at 777-78 (stating that "*Walton* therefore squarely forecloses any argument that Arizona's subsection (F)(6) aggravating circumstance, as construed by the Arizona Supreme Court, fails to channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance and that make rationally reviewable the process for imposing a sentence of death") (internal quotation and citation omitted). Further, the *Walton* Court concluded that Arizona trial judges and the Arizona Supreme Court presumptively apply the limiting definitions of the (F)(6) aggravating circumstance to the facts of a capital case at trial and during appellate review. *Walton*, 497 U.S. at 653-54.

Here, the (F)(6) finding was based solely on cruelty. Petitioner's argument notwithstanding, the Arizona courts applied the constitutionally appropriate limiting definition. The trial court found that cruelty was established based on the mental anguish, pain, and suffering experienced by the victim for more than eight hours prior to being murdered. (RT 3/8/93 at 25-26.) The Arizona Supreme Court agreed with the trial court's finding and summarily rejected Petitioner's facial vagueness challenge. *See Lee*, 185 Ariz. at 558, 917 P.2d at 701. This decision was not based on an unreasonable application of law or determination of fact. *See Jeffers*, 497 U.S. at 779 ("[I]f a State has adopted a constitutionally narrow construction of a facially vague aggravating circumstance and if the State has applied that construction to the facts of the particular case, then the fundamental constitutional requirement of channeling and limiting the sentencer's discretion in imposing the death penalty has been satisfied") (internal quotation and citation omitted); *see also Arave v. Creech*, 507 U.S. 463, 477 (1993) ("our decisions do not authorize review of state court

1    cases to determine whether a limiting construction has been applied consistently.").

2        **Claim 8-C**

3        Petitioner contends that Arizona's capital statutory scheme violates the Eighth

4    Amendment because it requires a capital defendant seeking leniency to prove that the

5    mitigating circumstances substantially outweigh the aggravating factors. (Doc. 52 at 107-

6    08.) This claim was squarely rejected in *Walton*, 497 U.S. at 651-52; *see also Kansas v.*

7    *Marsh,* 548 U.S. 163, 172-73 (2006).  The Arizona Supreme Court's summary dismissal of

8    this issue, *see Lee*, 185 Ariz. at 553, 917 P.2d at 696, was neither contrary to nor an

9    unreasonable application of controlling federal law.

10       **Claim 8-D**

11        Petitioner contends that Arizona's death penalty statute unconstitutionally restricts the

12   ability of the sentencing court to consider mitigating evidence because it requires that

13   mitigation evidence be established by a preponderance of the evidence. (Doc. 52 at 108-09.)

14   Again, this issue is foreclosed by *Walton*, 497 U.S. at 651, which held that Arizona's

15   allocation of the burdens of proof in a capital sentencing proceeding does not violate the

16   Constitution. *Id*; *see also Delo*, 507 U.S. at 275-76.  Therefore, the Arizona Supreme Court's

17   ruling denying this claim was neither contrary to nor an unreasonable application of

18   controlling federal law.

19       **Claims 9-A and 9-B**

20       In Claims 9-A and 9-B, Petitioner asserts that counsel's investigation of relevant

21   defenses was deficient and that counsel unreasonably selected and presented an alibi defense,

22   both to his prejudice. (Doc. 52 at 109-45.) Respondents concede that Petitioner raised these

23   allegations in his PCR petition, where he argued that counsel was ineffective for not pursuing

24   intoxication as a defense and for unreasonably selecting an alibi defense despite Petitioner's

25   statement to counsel that he was at the scene of the crime. (*See* ROA-PCR 3 at 14-18.)

26       To prevail on a claim of ineffective assistance of counsel, a petitioner must show that

27   counsel's performance was deficient and that counsel's deficient performance prejudiced his

28

- 33 -

defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). The performance inquiry asks whether counsel's assistance was reasonable considering all the circumstances. *Id.* at 688-89 (referring to prevailing norms of practice regarding how best to represent a criminal defendant). "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." *Id.* at 689 (internal quotation and citation omitted).

While trial counsel has "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary[,] . . . a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 691. In making this assessment, the court must "conduct[] an objective review of [counsel's] performance, measured for reasonableness under prevailing professional norms, including a context-dependent consideration of the challenged conduct as seen from counsel's perspective at the time." *Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (internal quotation and citation omitted). The Supreme Court has instructed that "[i]n judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made" and by applying deference to counsel's judgments. *Rompilla v. Beard*, 545 U.S. 374, 381 (2005) (quoting *Strickland*, 466 U.S. at 689).

A petitioner must affirmatively prove prejudice by "show[ing] that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* "The assessment of prejudice should proceed on the assumption that the decision-maker is reasonably, conscientiously, and impartially applying the standards that govern the decision." *Id.* at 695. If the prosecution's case is weak, there is a greater likelihood that the outcome of the trial would have been different.

1    *See Johnson v. Baldwin*, 114 F.3d 835, 839-40 (9th Cir. 1997).

2         Under the AEDPA, this Court's review of the state court's decision is subject to another

3    level of deference.  *Bell v. Cone*, 535 U.S. 685, 698-99 (2002); *see Knowles v. Mirzayance*,

4    129 S. Ct. 1411, 1420 (2009) (noting that a "doubly deferential" standard applies to

5    *Strickland* claims under the AEDPA).  Therefore, to prevail on an IAC claim, Petitioner must

6    make the additional showing that the state court, in ruling that counsel was not ineffective,

7    applied *Strickland* in an objectively unreasonable manner.  28 U.S.C. § 2254(d)(1).

8         Finally, a court need not address both components of the inquiry, or follow any

9    particular order in assessing deficiency and prejudice.  *Strickland*, 466 U.S. at 697.  If it is

10   easier to dispose of a claim on just one of the components, then that course should be taken.

11   *Id.*

12        <u>Background</u>

13        The PCR court conducted a four-day evidentiary hearing on Petitioner's IAC claims.

14   The court heard testimony from defense counsel, Assistant La Paz County Public Defender

15   Steven Politi; Politi's supervisor, former La Paz County Public Defender (now La Paz

16   County Superior Judge) Michael Burke; La Paz County Attorney Steven Suskin; an IAC

17   defense expert, Michael Kimerer; and the prosecution's investigator, Terry Stewart.

18        Trial counsel Politi testified that he met with Petitioner approximately 76 times to

19   discuss the case.  (RT 4/16/02 at 31; Doc. 90-1 at 20-40.)  Politi spent a considerable amount

20   of time focused on a plea offer, in which the prosecution promised not to pursue the death

21   penalty in exchange for a guilty plea.  (RT 4/16/02 at 29-30.)  Based on the strong evidence

22   against Petitioner, counsel encouraged him on numerous occasions to accept the plea.  (*See*

23   *id.* at 31, 41-42, 50-51, 64; *see also* Doc. 90-1 at 22-32.)   According to Politi's PCR

24   testimony and his detailed work log, Petitioner finally agreed to accept the deal in August

25   1992 and signed a plea agreement; a change of plea hearing was scheduled.  (Doc. 90-1 at

26   32; RT 4/16/02 at 83-84.)  However, prior to the hearing, Petitioner changed his mind and

27   refused to plead guilty.  Instead, he opted to go to trial to pursue an alibi defense.

28

Politi's testimony at the PCR hearing further established that Petitioner wanted to pursue an alibi defense in the hope of being fully acquitted of the murder charge:

> Q.   And is it your memory now that you did not recommend or advise Darrel Lee to pursue this alibi theory at trial?
>
> A.   I told Darrel that I thought alibi would be the wrong thing to do.
>
> Q.   And short of taking the plea agreement, what theory of the case did you think would have faired [sic] better had Mr. Lee agreed?
>
> A.   It wasn't so much a matter of what I thought would have faired [sic] better.  I was 100 percent absolutely convinced that an alibi would go nowhere. I didn't have a lot of room to play as far as a defense goes, but I felt as though Karen Thompson was the – I felt that she was running the show, and I – in my mind, I felt like the best I might be able to do at trial is to bring that out and maybe, in combination with her running the show and Darrel's extreme level of intoxication, maybe the jury would have come back on something less then first degree.
>
> . . . .
>
> Q.   For that theory you just described to have worked, would you agree that you would have had to have Darrel Lee cooperate in presenting that defense?
>
> A.   Yeah. Yeah.
>
> Q.   So if he wouldn't cooperate in presenting that defense, is it fair to say you would have abandoned the theory?
>
> A.   Yeah.  Well, I never would have given up trying to do that, but I – obviously, without Darrel's cooperation, I couldn't do that.  I don't think I ever stopped trying to get Darrel to – to cooperate with anything other than alibi.
>
> Q.   And it was – was it your feeling then that – that he continued to insist on this – presenting this alibi defense despite your advice to the contrary?
>
> A.   Yes.  The alibi . . . .  What Darrel made clear to me was – was that the only acceptable result as far as he was concerned was that if he would go to trial, be found not guilty on all counts, and then walk away.
>
> Q.   And that was the result he wanted you to obtain?
>
> A.   He told me that – that was the only acceptable outcome as far as he was concerned.

(RT 4/16/02 at 60-62.)

In preparation for sentencing, when Petitioner disclosed to his mental health expert that he was involved in the murder, Dr. Garcia-Buñuel questioned Petitioner about his refusal to

accept the plea agreement:

> I asked him why he did not accept the plea offer which would have saved him from a likely death penalty. He said he had not killed Mr. Anderson, nor had he intended for him to die. He further said that he had caused enough misery to his parents, "who always stuck with me," that, if he accepted the plea it would amount to telling them that he had, in fact, committed murder. He did not want to do that.

(Doc. 90-2 at 33.)

Petitioner insisted that counsel present an alibi defense, contending that a man named "Chivo" was with Thompson at the time of the murder. (RT 4/16/02 at 39, 41, 56-60, 70, 76, 135-36.) Politi testified that he attempted to secure support for Petitioner's alibi, but discovered no corroborating evidence. (*Id.* at 57-60, 75-76, 78-79.) Investigators Austin Cooper and Rick Paterson tried to locate witnesses who could verify that Petitioner was not with Thompson on the day of the crime. (*Id.* at 48, 56-59, 74-76, 78.) At counsel's direction, the investigators also pursued other alibi-related leads provided by Petitioner. (Doc. 90-2 at 71; *see also* RT 4/18/02 at 269.)

Counsel also began an investigation into a possible mental state defense. (RT 4/16/02 at 65-70, 96-99.) He sought and was granted authorization to secure the appointment of a mental health expert. (ROA 24; RT 6/29/92; RT 8/3/92; ME 8/3/92.) He asked Dr. Anthony Munoz to evaluate Petitioner, explaining that he was investigating a defense based on Petitioner's cocaine and alcohol intoxication at the time of the murder. (ROA-PCR 3, Ex. 6.) Counsel testified that he wanted to use Petitioner's state of intoxication, in conjunction with Karen Thompson's leading role in the criminal activity, to secure a conviction on a lesser count than first-degree murder. (RT 4/16/02 at 61, 71-73.) Ultimately, Dr. Munoz refused to travel to Parker, Arizona, to conduct the evaluation, and counsel did not seek a new expert because by that time an intoxication defense was inconsistent with the alibi defense insisted on by Petitioner. (*Id.* at 98-99.)

Despite Petitioner's insistence on an alibi defense, counsel continued to advise Petitioner to accept the plea agreement up until trial commenced in November 1992. (*Id.* at

64; Doc. 90-1 at 35.)  He also enlisted the aid of others, including Petitioner's parents, to convince Petitioner to accept the plea.  (RT 4/16/02 at 82-83; Doc. 90-1 at 32.)  Politi's supervisor, Michael Burke, also attempted to persuade Petitioner to abandon the alibi defense and to testify in support of a voluntary intoxication defense as a means of negating specific intent and avoiding a conviction for first-degree murder.  (Doc. 90-1 at 29; RT 4/18/02 at 258-60, 265.)  Burke confirmed that Petitioner refused to cooperate with an intoxication defense, believing his alibi defense would result in acquittal because a convenience store clerk was going to testify that the man with Thompson shortly after the murder did not fit his description:

> Q.   So was it your opinion that Steve Politi also tried to urge Darrel Lee to pursue a diminished capacity or second degree murder defense?
>
> A.   Yes it was.
>
> Q.   And that would have – short of accepting a plea – that would have been what you and he had recommended as a trial strategy?
>
> A.   Yes.
>
> . . . .
>
> Q.   Do you recall Mr. Politi sending an investigator or doing an investigation on the alibi defense?
>
> A.   Yes.
>
> Q.   And specifically, do you recall Mr. Politi's retaining an investigator and asking him to try to find a person named Chivo?
>
> A.   Yes.
>
> Q.   Can you tell us who was Chivo?
>
> A.   Chivo was the person that Darrel said hooked up with Karen Thompson in Phoenix sometime between – or sometime after this time they were together at the motel and the time that Mr. Anderson was abducted. He was a drug user that hung around this trailer park down on Washington Street where I think Darrel either lived or frequented and met up with Karen and these other people. So it was Darrel's position that Chivo was the one that had gone with Karen Thompson and abducted Mr. Anderson. There was a witness from I believe a Texaco Station, Quick Check Convenience Store place – I believe it was in Blythe – that had given information to the police and I think maybe even testified at trial that he remembered Karen Thompson being there; and a person in proximity to her was a Mexican person, I think tall, thin with a mustache. I can't remember exactly, but

it certainly wasn't a description of Darrel at the time.  And, in fact, Darrel – Darrel was – his words were I'm hanging my hat on that for reasonable doubt in a conversation I had with him about going with the diminished capacity.  He said no.  This witness is gonna testify that this guy was in this convenience store, he said, that's the spitting image of Chivo.

. . . .

Q.   And is it your memory that you and Steve had advised Mr. Lee against advancing [the Chivo alibi defense] theory at trial?

A.   I did, yes.  I'm sure Steve did, too, because we discussed it together in a conversation at the jail.  Slated [sic] out to Darrel what my thoughts were on the alibi defense.

Q.   And you said you specifically had talked to Darrel Lee about the diminished capacity or second degree murder defense; correct?

A.   Correct.

Q.   And would you agree – let me ask you this:  did Darrel refuse to cooperate in that defense?

A.   He said that – he wasn't going to go with that.  He said he was – he wasn't there.  He had a witness that he was gonna present, this Chivo description and, in his words, were – he said that's – I think that's enough reasonable doubt for a not guilty verdict.

(RT 4/18/02 at 267-70.)

Petitioner did not testify at the PCR evidentiary hearing.  He did submit an affidavit, which claimed that "[d]uring one of our first in-depth meetings, early on in the case, I told Mr. Politi about my involvement in this case."  (POA-PCR 3, Ex. 1.)  The prosecutor's investigator, Terry Stewart, testified about a note in his file indicating that a plea meeting between Politi, Petitioner, and prosecutor Suskin took place on April 6, 1992, and that "Suskin advises that Darrel claims Anderson was murdered by Karen but admits he was present."  (RT 4/17/02 at 173.)  To support his claim that Politi should have withdrawn as counsel rather than present a "false" alibi defense, Petitioner proffered the following note from Politi's work log:

9/3[/92] JAIL VISIT - Told [Petitioner] re my conversation with his father this afternoon and the inevitable ethical dilemma I face as regards the alibi defense. Discussed problem with Mike Burke, and the likely necessity of filing a motion to withdraw based upon an inevitable conflict of interest.

(Doc. 90-1 at 32.)  Petitioner also elicited testimony from an experienced criminal defense attorney concerning the difficult ethical issues associated with a client who confesses guilt to counsel but insists on an alibi defense.  (RT 4/17/02 at 179-82.)

Following the hearing, the state PCR court denied relief:

> As to claim #3 counsel argues that Mr. Politi, Lee's trial counsel, acted unethically when, after Lee confessed the murder to him or at least told him about his involvement in it, he allowed Lee to take the stand and present a false alibi defense.  On the basis of what I heard, I cannot conclude that Mr. Lee confessed the crime of murder to Mr. Politi or that Mr. Politi acted unethically.  But even if he did, I find that there was no reasonable probability that, but for Politi's performance, the result of the trial or the sentencing would have been different.

(ROA-PCR-ME 34 at 2.)

Discussion

Petitioner alleges that counsel failed to fully investigate a voluntary intoxication defense, unreasonably chose alibi over intoxication as a defense, and unethically presented a false alibi defense.  Although claims of ineffective assistance of counsel are generally governed by *Strickland*, Petitioner first argues that counsel's selection of an alibi defense was so unreasonable that he is entitled to presumptive relief under *United States v. Cronic*, 466 U.S. 648 (1984).  (Doc. 52 at 129-33.)

*Application of Cronic*

In *Florida v. Nixon*, 543 U.S. 175, 190 (2004), the Court described *Cronic* as a

> narrow exception to *Strickland's* holding that a defendant who asserts ineffective assistance of counsel must demonstrate not only that his attorney's performance was deficient, but also that the deficiency prejudiced the defense.  *Cronic* instructed that a presumption of prejudice would be in order in "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified."

*Id.* (quoting *Cronic*, 466 U.S. at 658).  The *Cronic* Court indicated that the application of presumptive prejudice is appropriate when "there [is] a breakdown in the adversarial process," such that "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing."  *Cronic*, 466 U.S. at 659, 662.  However, the Court made clear that the *Cronic* exception is very narrow, stating "[w]hen we spoke in *Cronic* of the possibility of

- 40 -

1    presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated

2    that the attorney's failure must be complete." *Bell*, 535 U.S. at 696-97.

3        Petitioner contends that *Cronic* applies here because counsel's unreasonable selection

4    of an alibi defense led him to agree to evidentiary stipulations that eased the prosecutor's

5    burden of proof at trial but did not benefit him. (Doc. 52 at 129-33.) Petitioner contends that

6    counsel, by entering into the stipulations, did not put the prosecution to the task of proving

7    the charges against him.[6] (*Id.* at 130-31.) Petitioner further argues that counsel's presentation

8    of an alibi defense was used as an excuse not to challenge the State's evidence, including

9    gruesome photographs of the victim and complimentary comments about the victim made

10   by the prosecutor during opening statement. (Doc. 52 at 132.)

11       The Court concludes that *Cronic* is inapplicable. Counsel presented an alibi defense

12   at trial, which was supported by Petitioner's testimony. (RT 11/17/92 at 113-191.) In the

13   context of this defense, counsel did not fail to test the prosecutor's case. Rather, he presented

14   the defense in a strategic manner by providing opening and closing remarks, cross-examining

15   prosecution witnesses, and presenting defense witnesses.

16       Even if counsel could have objected to certain evidence and his agreement to

17   evidentiary stipulations eased the prosecution's job at trial, such alleged failings do not

18   implicate *Cronic* with its narrow exception for cases in which counsel's performance

19   constituted the abandonment of all meaningful adversarial testing of the prosecution's case.

20   *See United States v. Thomas*, 417 F.3d 1053, 1059 (9th Cir. 2005). As the Court reiterated

21   in *Bell*, the attorney's failure to test the prosecutor's case must be complete. *Bell*, 535 U.S.

22   at 696-97.

23   _____

24       [6]    Those stipulations included: the victim's dental records, without a witness to

25   authenticate and identify them; credit card and ATM records showing Karen Thompson's use
     of the victim's credit cards; Detective Masino's testimony about the activities of the Phoenix

26   Police Department without hearsay or foundational objections; and the blood types of

27   Petitioner, Thompson, and the victim without the foundational witnesses. (Doc. 52 at 115
     n.22 (citing RT 11/10/92 at 155-56).)

28

1

*Application of Strickland*

2      Counsel have a duty to make a reasonable investigation or to make a reasonable

3 decision that makes particular investigations unnecessary. *See Strickland*, 466 U.S. at 691.

4 Counsel must conduct more than a cursory investigation. *See Rios v. Rocha*, 299 F.3d 796,

5 805-06 (9th Cir. 2002) (counsel must interview more than one witness before abandoning a

6 particular defense). For mental state defenses, counsel cannot ignore abundant signs of

7 mental illness or rest on a preliminary examination. *See Mickey v. Ayers*, 606 F.3d 1223,

8 1237 (9th Cir. 2010). However, counsel need not investigate interminably. *Id.* After

9 investigating relevant defenses, counsel must reasonably select and present a defense at trial.

10 *Phillips v. Woodford*, 267 F.3d 966, 980 (9th Cir. 2001). Finally, although counsel may have

11 properly investigated the relevant defenses, he may still act unreasonably in his selection of

12 the defense to present at trial. *See Mickey*, 606 F.3d at 1236.

13      Petitioner argues that counsel was aware that he and Thompson had used cocaine and

14 alcohol at the time of the crimes and thus should have fully investigated and presented a

15 voluntary intoxication defense. Petitioner also faults counsel for not seeking a replacement

16 expert for Dr. Munoz. The Court concludes that these aspects of counsel's performance do

17 not entitle Petitioner to relief under *Strickland*.

18      First, "Arizona does not allow evidence of a defendant's mental disorder short of

19 insanity either as an affirmative defense or to negate the *mens rea* element of a crime." *State*

20 *v. Mott*, 187 Ariz. 536, 541, 931 P.2d 1046, 1051 (1997). A defendant cannot present

21 evidence of mental disease or defect to show that he was *incapable* of forming a requisite

22 mental state for a charged offense. *Id.* at 540, 931 P.2d at 1050; *see Clark v. Arizona*, 548

23 U.S. 735 (2006) (upholding the constitutionality of the *Mott* rule and finding that the

24 exclusion of expert testimony regarding diminished capacity does not violate due process).

25      Although voluntary intoxication is not a defense to a crime in Arizona, at the time of

26 Petitioner's offense the fact that a defendant was intoxicated could be taken into

27 consideration when determining his culpable mental state if the offense required the mental

28

state of "intentionally" or "with the intent to." *See* A.R.S. § 13-503 (1991). However, it was also the law that an expert could not give an opinion on the ultimate question of whether Petitioner had acted with specific intent when he committed the crimes. *See Gretzler v. Stewart*, 112 F.3d 992, 1003 (9th Cir. 1997) (citing *State v. Christensen*, 129 Ariz. 32, 35-36, 628 P.2d 580, 583-84 (1981)). Aside from counsel's failure to replace Dr. Munoz, Petitioner does not allege that counsel failed to investigate other avenues to support an intoxication defense. Although there was minimal evidence of intoxication from Thompson (and perhaps Petitioner if he had chosen to testify in this regard), "[t]he law does not require counsel to raise every available nonfrivolous defense." *Knowles v. Mirzayance*, 129 S. Ct. at 1422. In addition, while voluntary intoxication could have been considered by the jury to negate the specific intent required for the felonies underlying the felony-murder charge, there was strong evidence that Petitioner intended to kidnap and rob the victim. Also, as discussed more fully in Claim 10-A, evidence of intoxication was inadmissible with regard to the premeditated murder charge.

Second, and most significantly, counsel testified at the PCR hearing that it was Petitioner who, after rejecting the plea offer, insisted on testifying and presenting an alibi defense and refused to cooperate with any other defense that put him at the scene of the murder. (RT 4/16/02 at 55, 61-62, 121.) Because an alibi defense was inconsistent with admitting being at the scene in an intoxicated condition, it was not unreasonable for counsel to discontinue investigating an intoxication defense. *See Bean v. Calderon*, 163 F.3d 1073, 1082 (9th Cir. 1998) (concluding that once counsel reasonably chose to present an alibi defense, his duty to continue investigating a diminished capacity mental health defense was at an end); *Turk v. White*, 116 F.3d 1264, 1267 (9th Cir. 1997) (justifying counsel's decision to discontinue investigating mental incompetency defense after reasonably deciding to pursue self-defense).

Moreover, both counsel and his supervisor attempted to dissuade Petitioner from presenting an alibi defense, endeavoring to convince him of the strength of the State's case

and the weakness of his alibi.  (RT 4/16/02 at 72-73; RT 4/18/02 at 258-60, 265.)  Their efforts failed.  At trial, Petitioner took the stand and testified that he was not at the scene of the murder.  (RT 4/16/02 at 37, 135-36.)  In addition, counsel testified at the PCR hearing that he did not believe he could prevent Petitioner from presenting his alibi defense.  (*Id.* at 37.)  Petitioner did not testify at this hearing or present any other evidence to rebut counsel's assertion that Petitioner was the one who had insisted on the alibi defense.

It is well settled that a defendant's own statements or actions influence the evaluation of reasonableness of counsel's actions.  *Strickland*, 466 U.S. at 691.  Furthermore, the decision whether to exercise the constitutional right to testify belongs to the defendant.  *See Jones v. Barnes*, 463 U.S. 745, 751 (1983); *Rock v. Arkansas*, 483 U.S. 44, 52-53 (1987) (defendant has a constitutional right to testify on his own behalf).  Counsel cannot be faulted for failing to prevent Petitioner from exercising his right to take the stand and testify that he was not at the murder scene.  *See Faretta v. California*, 422 U.S. 806, 820 (1975) (stating that trial counsel, while held to a standard of reasonable effectiveness, is still only an assistant to the defendant and not the master of the defense); *Mulligan v. Kemp*, 771 F.2d 1436, 1441 (11th Cir. 1985) (same).  Rather, if the client insists on a certain defense, and counsel competently explains the potential problems with that defense, then counsel's ultimate decision to follow the client's will may not be disturbed.  *See Bean*, 163 F.3d at 1081-82 (holding that counsel reasonably chose to present alibi defense after client told counsel he was not at the scene and refused to present an alternative mental health diminished capacity defense).  Counsel's performance cannot be challenged under the premise that a reasonably competent attorney would have dissuaded Petitioner from insisting on an alibi defense.  *See id.*; *see also Moore v. Johnson*, 194 F.3d 586, 605-06 (5th Cir. 1999) (rejecting the argument that counsel was ineffective for being unable to persuade the client to abandon alibi defense).

The cases Petitioner cites in support are inapposite.  In *Jennings v. Woodford*, 290 F.3d 1006 (9th Cir. 2002), the Ninth Circuit found ineffectiveness where counsel did not

1  reasonably investigate the defendant's mental health and drug abuse before selecting an alibi

2  defense.  However, the defendant in *Jennings* did not affirmatively direct counsel to pursue

3  an alibi defense or insist on testifying.  In *Phillips v. Woodward*, 267 F.3d at 979-80, counsel

4  failed to confront the defendant about the factual difficulties of his alibi defense despite

5  credible evidence suggesting Phillips was in fact the shooter.  Here, in contrast, counsel

6  confronted Petitioner about the weakness of his alibi and attempted to change his mind, but

7  Petitioner refused to cooperate with any other defense and testified at trial that he was not at

8  the scene of the crime.

9      Petitioner also alleges that counsel knew an alibi defense would be perjurious and thus

10  performed deficiently in presenting a false alibi rather than moving to withdraw as counsel

11  based on an ethical conflict.  (Doc. 52 at 133-34.)  In support, Petitioner cites *State v. Billy*

12  *Don Lee*, 142 Ariz. 210, 689 P.2d 153 (1984),[7] and Ethical Rule 3.3 of the Rules of the

13  Supreme Court of Arizona.[8]  In denying relief on this claim, the PCR court concluded that

14  counsel did not commit an ethical violation, inferentially determining that counsel did not

15  violate either ER 3.3 or *State v. Lee*.  (ROA-PCR-ME 34 at 2.)  The PCR court further found

16

17  ―――――――――――

18  [7]    *Lee* involved an attorney who unethically acquiesced to his client's demands that he present testimony by two witnesses that counsel believed would perjure themselves.

19  *Id.* at 212, 689 P.2d at 155.  After presenting the testimony, counsel moved to waive closing arguments because he could not "get up in front of the jury and make an argument based on

20  what [he was] positive . . . was perjured testimony."  *Id*. at 213, 689 P.2d at 156.  The court found counsel deficient for presenting false testimony and waiving closing argument.  *Id.* at

21  221, 689 P.2d at 164.  However, the *Lee* court did not address the issue here – a defendant exercising his right to testify and present his defense at trial.  *Id.* at 214 n.2, 689 P.2d at 158

22  n.2.  In addition, as discussed below, there is no evidence that counsel in this case believed Petitioner would intentionally perjure himself.

23

24  [8]    Arizona's Ethical Rule 3.3 provides that, "A lawyer shall not knowingly . . .

25  fail to disclose a material fact to a tribunal when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client . . .[or] . . . offer evidence that the lawyer knows to be

26  false.  If a lawyer has offered material evidence and comes to know of its falsity, the lawyer

27  shall take reasonable remedial measures."  Ariz. R. Sup. Ct. 42, ER 3.3 (West 1991).

28
                          - 45 -

that Petitioner did not confess his role in the abduction and murder to defense counsel before trial.  (*Id.*)

After careful review of the record, this Court concludes that the PCR court's findings are not unreasonable given the evidence presented at the state hearing.  Politi's supervisor testified that the facts of Petitioner's case did not warrant withdrawal on ethical grounds:

> Q.   And would you agree that as far as having an ethical duty to withdraw, that there's a difference between an attorney faced with a situation where his client has sat down and confessed his participation in a murder versus a situation where the client or the attorney has knowledge or believes that the defendant is guilty based on the evidence and the investigation he has done?
>
> A.   Yes.
>
> . . . .
>
> Q.   . . . Let me ask you this: If Mr. Politi had filed a motion to withdraw in La Paz County at that time with two attorneys on staff at the public defender's office, what would be your opinion of the likelihood of success?
>
> A.   I – I don't know.  It would depend, I think on – if it were the latter situation, which I seem to recall it being, it probably wouldn't get granted. . . When you're in that kind of situation, the latter situation where the evidence is strong against your client, I mean, extremely strong, your client still denies that he was involved – he or she was involved in that, I mean, that happens.  That's almost like 80 percent of the cases you have, you know, strong evidence against your client.  Your client still wants to go – in the beginning anyway, profess their innocence.  And in those kind of cases, if you go to the court and ask for a motion to withdraw based on those grounds, you're basically telling the court I think my client's guilty; and I think in those situations, you almost have an ethical duty not to file a motion to withdraw . . .

(RT 4/18/02 at 271-72.)  Rather, it appears Burke believed Politi had an ethical duty *not* to withdraw.  *See, e.g.*, *Lowery v. Cardwell*, 575 F.2d 727 (9th Cir. 1978) (stating that counsel's motion to withdraw after defendant testified to what counsel believed was perjury prejudiced defendant before the trier of fact and entitled defendant to a new trial); *see also State v. Jefferson*, 126 Ariz. 341, 615 P.2d 638 (1980) (same).  Regarding the "ethical dilemma" noted in counsel's work log, Burke believed this referred to information about the victim's car that Politi received from Petitioner's father, which led Politi to question Petitioner's alibi story.  (RT 4/18/02 at 261-62, 265-66.)  However, the fact that counsel questions or doubts his client's story does not mandate withdrawal.

Burke also testified that Petitioner never confessed his participation in the murder to him and that it was his best recollection that Petitioner did not confess his full involvement to Politi until after trial. (RT 4/18/02 at 260, 265.) Politi testified that he did not specifically recall whether Petitioner told him about his involvement in the kidnapping and murder before trial. (RT 4/16/02 at 31-32.) Petitioner did not testify, and his affidavit did not specifically detail what facts he allegedly relayed to Politi; rather, he indicated only that he discussed with counsel his "involvement in the case." (ROA-PCR 3, Ex. 1.) The only credible evidence that Politi was aware prior to trial that Petitioner was at the scene came from the prosecution investigator's notes of a plea negotiation meeting between Politi, Petitioner, and the prosecutor. However, the investigator testified that he was not actually at the meeting and did not hear Petitioner make any statements about his involvement in the crime, and the prosecutor testified that he had no specific recollection of the meeting.[9] (RT 4/17/02 at 175; RT 4/18/02 at 79.) Politi also testified that he did not remember whether Petitioner admitted being at the scene during this plea negotiation. (RT 4/16/02 at 34-35.)

Based on this record, the Court concludes that the state court's determination that no ethical violation occurred was not unreasonable. Indeed, Petitioner's own expert testified that counsel's obligations with respect to a client whom an attorney suspects is not truthful are not always clear; thus it was not outside the wide range of professional assistance for Politi to continue his representation after Petitioner insisted on pursuing an alibi defense. Even if at some point before trial Petitioner told counsel he was at the scene, it would have

---

[9] In these proceedings, Petitioner has proffered a transcribed interview from 1992 between Petitioner's father and the prosecutor wherein the latter recalls Petitioner telling him he was at the scene of the crime. (Doc. 53, Ex. R.) However, this information was never presented in state court, despite the fact that it was in the defense file and available to Petitioner. (Doc. 52 at 111, n.20.) In its September 2006 order, this Court denied Petitioner's request for an evidentiary hearing and expansion of the record because Petitioner was not diligent in developing this evidence during the PCR proceedings. (Doc. 87 at 28-31.) Thus, this Court is prohibited from considering the exhibit. *See* 28 U.S.C. § 2254(e)(2); *Holland v. Jackson*, 542 U.S. 649, 653 (2004).

been reasonable for counsel to discount this assertion given Petitioner's conflicting stories. As observed by Politi's supervisor, this is not a case where the defendant informed counsel he was guilty but intended to lie on the stand, and the record does not support a finding that counsel was aware Petitioner intended to perjure himself.

In sum, the Court concludes that the state court's decision denying Petitioner's allegations of IAC at trial was neither contrary to nor an objectively unreasonable application of *Strickland* and was not based on an unreasonable determination of the facts.

**Claim 9-D**

Petitioner asserts that trial counsel was ineffective for failing to investigate and present available and relevant mitigating evidence at sentencing. (Doc. 52 at 160-84.) The right to effective assistance of counsel applies not just to the guilt phase but "with equal force at the penalty phase of a bifurcated capital trial." *Silva v. Woodford*, 279 F.3d 825, 836 (9th Cir. 2002) (quoting *Clabourne v. Lewis*, 64 F.3d, 1373, 1378 (9th Cir. 1995)).

Sentencing Proceedings

Following his conviction, the parties stipulated that Petitioner be examined by a mental health expert pursuant to Rule 26.5 of the Arizona Rules of Criminal Procedure.[10]  (RT 1/11/93; RT 1/25/93.)  The court referred Petitioner to Michael B. Bayless, Ph.D., and, at defense counsel's request, to Dr. Leonardo Garcia-Buñuel, a forensic psychiatrist. (ROA 85.)  After receiving their reports, the court indicated it would not consider them absent a specific request to do so from one of the parties.  (RT 2/10/93 at 3.)

Defense counsel Politi then filed a 15-page presentencing memorandum, relying in substantial part on Dr. Garcia-Buñuel's report to establish mitigation. (Doc. 90-2 at 9-23.) As discussed above in Claim 5-D, counsel asserted that Petitioner's ability to know right

---

[10]     Rule 26.5 provided:  "At any time before sentence is pronounced, the court may order the defendant to undergo mental health examination or diagnostic evaluation. Reports under this section shall be due at the same time as the pre-sentence report unless the court orders otherwise."  Ariz. R. Crim. P. 26.5 (West 1991).

from wrong and to control his conduct was significantly impaired, that he was a minor participant, and that he did not foresee that his conduct would create a grave risk of death. *See* A.R.S. § 13-703(G)(1), (3) & (4).  He also urged that the following non-statutory mitigating factors were present: organic brain syndrome, secondary to chronic polysubstance abuse; potential for rehabilitation; remorse; admission of guilt; low intelligence; close family ties and parental support; being a follower in the crime; and the fact his more culpable co-defendant received a life sentence.  (Doc. 90-2 at 21-23.)

The sentencing court held an aggravation/mitigation hearing on February 10, 1993.  The State indicated that it intended to call no witnesses and would instead rely on the testimony at trial to establish the "pecuniary gain" and "heinous, cruel, or depraved" aggravating factors.  It also proffered evidence to establish Petitioner's prior robbery conviction as an aggravating factor.  Politi similarly declined to present any live witnesses, stating that the "bulk of [his] case" was contained in his presentencing memorandum.  (RT 2/10/93 at 8.) He asked the court to consider Dr. Garcia-Buñuel's report in support of the alleged mitigating factors.  (*Id.* at 22.)  He also submitted copies of Petitioner's high school records to establish low intelligence and lack of education and introduced a typewritten letter from Petitioner's mother pleading that her son's life be spared and stating that Petitioner was loved by his family, despite being "some how mentally disturbed."  (*Id.* at 21; Doc. 90-2 at 26.)

Politi further argued that Petitioner's prior conviction did not qualify as a crime of violence for the purpose of establishing the (F)(2) aggravating factor, that the (F)(5) pecuniary gain factor was inapplicable due to lack of notice, and that the anguish of the victim was insufficient to prove cruelty under (F)(6).  (RT 2/10/93 at 33-37.)  He also challenged the "heinous or depraved" aspect of the (F)(6) factor and the lack of evidence to establish whether the victim died as a result of being strangled by Petitioner or struck in the head by Thompson.  (*Id.* at 38-43.)  Counsel further asserted that the jury's general first-degree murder verdict foreclosed any finding that he killed, attempted to kill, or intended to kill under *Enmund v. Florida*.  (*Id.* at 46-47.)  Finally, he urged the court to find the

mitigating factors alleged in his memorandum, including the fact that Petitioner and Thompson had been using cocaine intravenously for at least four days before the offense. (*Id.* at 44-46.)

At the conclusion of the hearing, the court directed its probation department to prepare a presentence report ("PSR") with the caveat that it should not make a sentencing recommendation. (*Id.* at 55.)   The court ordered the PSR because it might "contain information of a mitigating nature." (*Id.* at 8.)   To the PSR writer, Petitioner continued to maintain his innocence and declined to discuss the offense but was otherwise cooperative and provided his social history. (Doc. 92, Ex. C at 5.)   He described his upbringing as "alcohol tolerant, Pentecostal church oriented and lenient discipline." (*Id.* at 8.)   His father was an alcoholic, who abused Petitioner's mother.   At some point his father started going to church and became a "new person." (*Id.*)   Petitioner dropped out of high school in his sophomore year and moved away from home at age 19.   Around age 22, he married Valerie Nelson; they divorced seven years later "due to his alcohol consumption, abuse, and infidelity." (*Id.*)   That same year he married Robin Rawcowski, whom he divorced after two years for similar reasons – alcohol abuse and infidelity.

Petitioner also told the PSR writer that at age 25 he admitted himself to St. Luke's Alcohol Rehabilitation, but left after three days. (*Id.* at 10.)   At some point, he also joined Alcoholics Anonymous.   Petitioner denied ever taking drugs prior to going to prison for the first time in 1987, but while there used cocaine, heroin, and methamphetamine, which he bought with workers' compensation funds he received monthly as the result of a job-related injury. (*Id.* at 10, 12.)   He continued using drugs after his release from prison in 1990.   By the time of the offense in December 1991, "everything in his life was directed to Cocaine and his habitual consumption of it." (*Id.*)   The PSR writer concluded that Petitioner's past substance abuse was probably greater than he had divulged and that several DUI convictions between 1983 and 1990 confirmed his problems with alcohol.   He also observed that although Petitioner claimed innocence, in a letter attached to the PSR "he has expressed

1  remorse for the deceased victim and for having any involvement in this crime." (*Id.* at 11;
2  *see also* Doc. 92, Ex. B.)

3      Petitioner's sentencing took place on March 8, 1993. As an initial matter, the judge
4  remarked that he had not read Dr. Bayless's report because no one had requested it, but that
5  he had reviewed Dr. Garcia-Buñuel's.[11] (RT 3/8/93 at 2-3.) That report stated that Garcia-
6  Buñuel met with Petitioner, interviewed Petitioner's mother, consulted with Politi, and
7  reviewed police department reports. (Doc. 90-2 at 28.) Mrs. Lee described Petitioner as a
8  high-strung child, who did not get along well with others but was not violent. She also
9  relayed that Petitioner's grandfather was an alcoholic. (*Id.* at 29.)

10     Petitioner told Garcia-Buñuel about dropping out of school, but said it was because he
11 was regularly high on marijuana and LSD and could not concentrate. He also reported that
12 his older brother had been shot and killed during a burglary when Petitioner was only 15
13 years old.[12] "This was a devastating blow to him and his family" and led Petitioner to
14 recklessly abuse drugs for the next 20 years. (*Id.*) Dr. Garcia-Buñuel opined that this event
15 may explain why Petitioner's parents have tended to overprotect him despite his irresponsible
16 and criminal actions. (*Id.*) Petitioner also repeated the story to Garcia-Buñuel regarding his
17 introduction to cocaine and his escalated use following release from prison. However, unlike
18 his statement to the PSR writer, Petitioner confessed to Garcia-Buñuel his involvement in the
19 crime.

20

21

22     [11]   To Dr. Bayless, Petitioner had denied his involvement in the crime, insisting
that he was not at the scene of the murder. (Doc. 90-2 at 39.) Dr. Bayless diagnosed
23 Petitioner with polysubstance dependence and antisocial personality disorder. (*Id.* at 41.)
He further concluded that Petitioner had the ability to know right from wrong and to control
24 his conduct. (*Id.*) Dr. Bayless met with Politi after the examination and told counsel he saw
25 no mitigating factors. (RT 4/16/02 at 116.)

26     [12]   It appears from new evidence proffered in these proceedings that Dr. Garcia-
27 Buñuel misunderstood this aspect of Petitioner's history. It was Petitioner's brother who was
15 in 1981 when he was killed; Petitioner was 25. (*See* Doc. 88-1 at 10.)

28

1  Petitioner said he had a good recollection of what happened that night. (*Id.* at 30.) He
2  and Thompson pulled off the highway and intravenously used more cocaine. Thompson said
3  she was not going to allow the victim to testify against her and send her back to prison. They
4  got out of the car and saw that the trunk was open and Anderson was gone. They then drove
5  around looking for him. After they saw him, Petitioner ran, tackled him, and held him down
6  as Anderson struggled to get free. Thompson said he must be killed and hit him in the face
7  with a large rock, killing him. (*Id.*) Petitioner repeatedly claimed that he did not intend for
8  the victim to die and that he could and should have prevented Thompson from killing him.
9  (*Id.* at 32.)

10  Dr. Garcia-Buñuel concluded that at the time of the crime Petitioner's alcohol and
11  cocaine intoxication complicated a preexisting organic brain syndrome that was secondary
12  to chronic polysubstance abuse. (*Id.* at 33.) Consequently, he opined that Petitioner's
13  capacity to conform his conduct to the law's requirements "would have been impaired to a
14  very severe degree." (*Id.*) In support of the "organic brain syndrome" diagnosis, Dr. Garcia-
15  Buñuel noted that "[a] combination of 'deja vue' [sic] premonitions and olphactory
16  hallucinations is strongly suggestive of brain damage of some sort." (*Id.* at 32.) However,
17  he did not recommend that Petitioner undergo psychological testing, an EEG, or brain
18  mapping because "his account of what happened did not suggest that such possible damage
19  would have so affected his behavior or actions at the time that it could have constituted a
20  defense against prosecution." (*Id.*) Petitioner also "did not seem interested in delaying his
21  sentencing by having to go through any additional examination or testing." (*Id.*)

22  In addition to Garcia-Buñuel's report, the court reviewed the PSR and heard the
23  attorneys' final argument on sentencing. (RT 3/8/93 at 4.) Politi urged the court to consider
24  that the purpose of Arizona's capital sentencing structure is to separate the exceptional
25  defendant, that proportionality review ensures that death is imposed only for the most
26  deserving, and that the court should resolve any doubt in Petitioner's favor. (*Id.* at 4-11.)
27  The prosecutor expressed his opinion that Petitioner should not be sentenced to death. *See*
28

*supra* discussion in Claim 5-A.  He observed that it was Petitioner's "own resistance and maybe even his own stupidity [that] ultimately led to him being . . . subject to the death penalty, and Karen Thompson is sitting in prison and will be for a life sentence but possibly out in 25 years or some date after that."  (*Id.* at 14-15.)

Following a recess to consider the prosecutor's position, the court pronounced sentence. It first found that both Petitioner and Thompson were under the influence of cocaine at the time of the killing and that Thompson's testimony at trial was more credible than Petitioner's version of events as relayed to Dr. Garcia-Buñuel.  (RT 3/8/93 at 23; *see also* ROA 99 at 2.) It then found the existence of the three aggravating factors alleged by the prosecution. *See* A.R.S. § 13-703(F)(1), (2) & (6).  Finally, the court determined

> that the following mitigation existed but was not substantial enough to call for leniency:  that defendant was remorseful (but only long after the killing); that he admitted his guilt (but only after being convicted); that he lacked education and had a low level of intelligence (but not significantly low); that he had strong family support (but which apparently had not favorably influenced his behavior in the past); that he was a "follower" by nature (but rather than being under Thompson's control was a full and willing participant in the murder); that Thompson received a life sentence (but only pursuant to a plea agreement that defendant had also been offered and had rejected); and that the prosecutor had recommended against the death penalty.

*Lee*, 185 Ariz. at 553, 917 P.2d at 696.  In finding that Petitioner was not significantly impaired by organic brain syndrome, the court noted that Dr. Garcia-Buñuel's conclusion was based solely on symptoms reported by Petitioner, that no psychological or neurological testing was done, and that there was no evidence to suggest that brain damage caused Petitioner to be violent.  (RT 3/8/93 at 27.)

On appeal, the Arizona Supreme Court conducted an independent review and agreed with the trial court's findings as to the alleged aggravating and mitigating circumstances. *Id.* at 559, 917 P.2d at 702.  It further found that the death penalty was an appropriate sentence because

> [t]he victim, a good samaritan who agreed to give two people a ride, undoubtedly spent many terrified hours leading up to and including his brutal killing.  His mental and physical anguish cannot be ignored.  This, coupled with the pecuniary gain motive and defendant's prior conviction, causes us to conclude that the

1    proffered mitigation was not sufficiently substantial to call for leniency.

2    *Id.*

3         Post-conviction Proceedings

4         In his state PCR petition, Petitioner asserted that counsel was ineffective for failing to

5    fully investigate potential mitigation and for not calling any witnesses at the

6    aggravation/mitigation hearing. (ROA-PCR 3 at 18-20.)  He also argued in a separate claim

7    that counsel was ineffective for failing to obtain a meaningful psychiatric evaluation by a

8    defense expert, as opposed to an expert appointed by the court to conduct a Rule 26.5

9    evaluation.[13]  (*Id.* at 20-28.)  In support of these arguments, he presented declarations from

10   his parents and reports from Dr. Geoffrey Ahern, a neurologist, and Dr. Anne Herring, a

11   neuropsychologist.  After deciding that an evidentiary hearing was necessary, the court

12   authorized Petitioner to retain Dr. Barry Morenz to prepare a comprehensive psychiatric

13   evaluation, and the State enlisted its own neuropsychologist, Dr. James Youngjohn.

14        Petitioner also moved for the appointment of Roseann Schaye as a mitigation specialist.

15   (ROA-PCR 13.)  Because Schaye resided in Tucson, the court asked counsel to contact Mary

16   Durand and Lisa Christianson, mitigation specialists working in the Phoenix area where

17   Petitioner grew up. (Doc. 43, RT 7/20/00 at 2-5.)  On September 28, 2000, the court held a

18   hearing to assess the availability of Durand as a mitigation specialist.  (Doc. 44, RT 9/28/00.)

19   PCR counsel acknowledged that she was the logical choice because she worked in Phoenix.

20   (*Id.* at 6.)  The court then appointed Durand, authorizing 400 hours at $75 an hour, plus

21   necessary in-state travel and office expenses. (ROA-PCR 36.)  However, although Durand

22   was provided more than 18 months to investigate, gather, and present mitigation evidence

23   for the evidentiary hearing, she failed to prepare a written report or submit mitigation

24   evidence for the court's consideration.  (RT 4/17/02 at 210-11; RT 9/28/01 at 3-6.)

25

26        [13]    Petitioner has not asserted in his federal habeas petition that counsel was

27   ineffective with regard to investigating Petitioner's mental state for mitigation.  *See infra*

28   Claim 9-E.

At the evidentiary hearing, Politi testified about the scope of his mitigation investigation.  Eight months before trial, he consulted with Hal Sheets, an experienced attorney at the Arizona Capital Representation Project, whose mission at the time was to assist defense lawyers in both the guilt and penalty phases of a capital trial.  (RT 4/17/02 at 223.)  Politi and Sheets "were in close touch."  (RT 4/16/02 at 47.)  They spoke by phone frequently, Politi visited him at his office repeatedly, and Sheets went to Parker on more than one occasion to assist the defense.  (*Id.*)  Just before trial, Politi sent him mitigation materials the defense had gathered, and Sheets had them reviewed by a mitigation specialist in his office.  (RT 4/16/02 at 92; Doc. 90-1 at 34; Doc. 90-2 at 130.)

In anticipation of a probable sentencing phase, Politi met with Petitioner regularly and, more than six months before trial, starting asking him about his social history, including his family, criminal history, drug use, and relationship with his parents.  (*Id.* at 47-48, 52.)  Around this same time, he spoke with Petitioner's mother and brother, both of whom agreed to help develop a "paper trail" of Petitioner's life, starting from birth through his arrest for Anderson's murder.  (*Id.* at 52-54.)  Counsel also interviewed Petitioner's ex-wife, Valerie Nelson, but she provided no useful information.  (*Id.*)  Just before the start of trial, counsel told Petitioner's parents that an investigator would be meeting with them to inquire about school records, babysitters, and the possibility that Petitioner had been exposed to toxic materials such as pesticides, herbicides, or fertilizers.  (*Id.* at 89.)  Politi's detailed work log supported this testimony.  (*See* Doc. 90-1 at 21, 23, 34.)

Four months before trial, Politi directed Rick Paterson, the defense investigator, to contact Petitioner's parents "to begin the search for his vital records."  (Doc. 90-2 at 60.)  Paterson met with Petitioner's parents and got information about his schools, dwellings (apparently to assess for lead), and any toxic exposure at jobs.  (RT 4/16/02 at 89-90; Doc. 90-1 at 34; Doc. 90-2 at 47.)  Paterson also interviewed Valerie Nelson, to discover whether she had any helpful information concerning Petitioner's substance abuse problems.  (Doc. 90-2 at 55.)  Nelson said they divorced in 1985 and so she had little knowledge of his life

1   since then.  (*Id.*)  She characterized Petitioner as "the nicest person in the world" when sober

2   but "a completely different person" when drunk and said he often experienced alcoholic

3   blackouts.  (*Id.*)  Nelson elaborated that Petitioner's drinking worsened after his brother's

4   death, which was a "great source of depression" for Petitioner.  (*Id.*)

5        Paterson also sent out numerous requests for information and about a month before trial

6   received records from the Arizona Department of Corrections ("ADOC"), ADOC's Health

7   Services Section, the John C. Lincoln Hospital, the Maricopa Medical Center, and the

8   Maricopa County Probation Department.  (Doc. 90-2 at 48, 56-57.)  Pursuant to Politi's

9   instruction, Paterson reviewed these records "for additional, potential witnesses and/or any

10  other information that may prove useful to the case."  (*Id.* at 56.)  The only observations he

11  made based on this review were that Petitioner had been medicated for depression while

12  incarcerated at the ADOC and that the probation officers who had dealt with Petitioner were

13  not available for interview.  (*Id.* at 57.)  Paterson also sought Petitioner's school records and

14  made significant efforts to obtain Petitioner's birth records and interview the doctor who had

15  delivered Petitioner, but discovered that the hospital records were no longer available and the

16  doctor did not return his calls.  (*Id.* at 43-45, 48-53, 57-58.)

17       Politi testified that his primary goal at sentencing was to present Petitioner's drug use

18  and intoxication to a mental health expert for evaluation as statutory mitigation under

19  A.R.S. § 13-703(G)(1).  (RT 4/16/02 at 95, 99.)  Counsel initially sought Dr. Munoz's

20  assistance, but he was not willing to travel to Parker.  (*Id.* at 97-98.)  Politi then consulted

21  with Dr. Barry Morenz in Tucson and sent him copies of the police reports.  (Doc. 90-1 at

22  37-38.)  For reasons not apparent in the record, one week later counsel contacted Dr. Garcia-

23  Buñuel.  (*Id.* at 38.)  Politi testified that he chose Garcia-Buñuel based on his expertise as a

24  forensic psychiatrist and familiarity with "cases like this."  (RT 4/16/02 at 99.)  He met and

25  discussed the case with Garcia-Buñuel both before and after the doctor's evaluation of

26  Petitioner.  (Doc. 90-1 at 38; Doc. 90-2 at 28.)  At the time, counsel consulted frequently

27  with Petitioner and Hal Sheets about the consequences of a confession at sentencing given

28

- 56 -

1    Petitioner's trial testimony and eventually convinced Petitioner it was in his best interest "to
2    just level with the doctor."   (Doc. 90-1 at 37-38.)   Although Petitioner relayed his
3    involvement in the crime to Dr. Garcia-Buñuel, he maintained his innocence during the
4    subsequent meeting with Dr. Bayless.

5        Politi further testified that he made a strategic decision not to have Dr. Garcia-Buñuel
6    testify at the aggravation/mitigation hearing because Garcia-Buñuel told him it would not be
7    a "good idea" to call him as a witness.  (RT 4/16/02 at 100.)  In addition, counsel did not
8    want to subject him to cross-examination.  (*Id.* at 100, 114-15.)  Politi explained that he and
9    Dr. Garcia-Buñuel had discussed administering tests to detect brain damage, but that the
10   doctor did not believe such evidence would be helpful at sentencing because he could not
11   connect any brain damage to what happened at the time of the killing.  (*Id.* at 114.)  "In other
12   words, [he could not] say what significance it has or doesn't have and why."  (*Id.*)  Counsel
13   was concerned that this lack of "causal connection" would be elicited on cross-examination.
14   (*Id.* at 114-15.)

15       Counsel also testified that he made a strategic decision not to call Petitioner's parents
16   as witnesses.  (RT 4/16/02 at 123; *see also* Doc. 90-2 at 6 (listing Petitioner's parents as
17   possible witnesses at aggravation/mitigation hearing).)  He determined that they would not
18   be credible because they had unwittingly helped Petitioner dispose of the victim's car and
19   then reported Petitioner to the police after learning on the news that the owner of the car was
20   missing.  (RT 4/16/02 at 124; *see also* RT 11/12/92 at 144-45; RT 11/13/93 at 104; RT
21   11/13/92 at 149-51.)  In addition, his parents had taken it upon themselves to conduct their
22   own investigation and spoke to numerous individuals in an attempt to bolster their son's alibi
23   defense; Politi had to tell them to stop harassing witnesses.  (RT 4/16/02 at 57-58, 88, 124;
24   *see also* Doc. 90-2 at 66-70; RT 11/13/92 at 152-53.)  Overall, Politi felt that Petitioner's
25   parents "were not able to deal with what was going on well enough to be able to assist me
26   at the sentencing."  (RT 4/16/02 at 125.)

27       Petitioner's mother also testified at the PCR hearing.  (RT 4/17/02 at 149-65.)  She
28

denied writing the typewritten letter admitted at sentencing requesting leniency, saying that although it was her signature she did not type. (*Id.* at 148-50; Doc. 90-2 at 25-26; ROA 94.) Mrs. Lee testified that she would have gone to the sentencing hearing if requested and would have provided information about Petitioner's life, his drug and alcohol abuse, his two marriages, and the fact that Petitioner went steadily downhill after his brother had been killed. (*Id.* at 151-54.) Mrs. Lee further testified that Petitioner had always maintained his innocence to her, never admitting any involvement in the murder. (*Id.* at 155.)

Petitioner did not call Drs. Ahern and Herring as witnesses at the PCR hearing, but Dr. Morenz summarized their findings in his testimony. Dr. Ahern administered an EEG and MRI to determine whether Petitioner had any gross abnormalities or structural defects in his brain. (RT 5/21/02 at 6, 23.) The EEG test results were normal in both awake and sleep states, and the MRI was normal with no structural abnormalities identified. (*Id.*; *see also* Doc. 90-1 at 4.) Dr. Herring administered a series of neuropsychological tests. She found some weaknesses in Petitioner's executive functioning but determined they were not dramatic deficits. (RT 5/21/02 at 7-10.) She opined that Petitioner "may have difficulty modulating his responses" and that his "poor impulse control, insecurity, and distrust of others likely contribute to his lack of effectiveness in personal relationships and may make him more susceptible to exercise of poor judgment and perhaps, violence." (Doc. 90-1 at 9.)

Dr. Morenz made a provisional Axis I diagnosis of cognitive disorder not otherwise specified, based on the weakness in cognitive functioning documented by Dr. Herring. (RT 5/21/02 at 17; *see also* Doc 90-1 at 18.) On cross-examination, he agreed that all of the criteria needed to satisfy this diagnosis were not present. (RT 5/21/02 at 25.) He further testified that his and Dr. Garcia-Buñuel's conclusions and diagnoses were similar. (*Id.* at 35-36.)

Dr. Morenz also made an Axis II diagnosis of personality disorder not otherwise specified. Counsel for the State pressed him to agree that Petitioner could be diagnosed with antisocial personality disorder:

Q.    Would you agree with me that the evidence to support a personality disorder, whether it be not otherwise specified or antisocial, that evidence is much stronger than the evidence to support some type of cognitive disorder?

A.    Oh, absolutely.   I don't think there would be – there would be any credible psychologist or psychiatrist who wouldn't agree that this man warrants a personality disorder diagnosis.   There may be some debate on whether he should be antisocial, antisocial and borderline, personality disorder not otherwise specified; but everybody is gonna agree that he warrants a personality disorder diagnosis, and it generally falls in – you know, has strong antisocial traits.

(*Id.* at 32-33.)   Finally, Dr. Morenz concluded that Petitioner's impairment at the time of the crime satisfied the (G)(1) mitigating factor.  (*Id.* at 18.)

In rebuttal, Respondents submitted the report of Dr. Youngjohn, who testified at the PCR hearing.  (*See* Doc. 90-2 at 73-88.)  Dr. Youngjohn disagreed with Dr. Morenz's diagnosis of cognitive disorder not otherwise specified, because there was no objective evidence of brain injury or neurologic disease.  (RT 5/21/02 at 72-73.)  He testified that Dr. Morenz based his cognitive disorder diagnosis on the test results of Dr. Herring, who found that Petitioner had some cognitive weakness.  (*Id.* at 74-75.)  However, Dr. Youngjohn disagreed with Dr. Herring's interpretation of her test results.  (*Id.* at 75.)  According to Dr. Youngjohn, the tests administered by Dr. Herring placed Petitioner mostly in the normal range and low-average on some tests.  (*Id.* at 76-77.)  He attributed the low test scores, not to any type of brain dysfunction, but to depression and psychological and emotional distress.  (*Id.* at 77-78.)  Under Dr. Youngjohn's interpretation, Petitioner's performance was normal both on the tests he administered and those given by Dr. Herring.   Petitioner had no brain damage or significant neurological impairment.  (*Id.* at 79, 82.)  Dr. Youngjohn agreed with the diagnoses of polysubstance abuse and antisocial personality disorder.  (*Id.* at 80-81.)

Following the conclusion of testimony, counsel submitted final arguments.  (ROA-PCR 93, 98.)  The PCR court then ruled, as follows:

[C]ounsel argues two things: that Politi did no investigation to see if there was mitigation and he presented no mitigation at the sentencing.   I, however, found ample evidence that Mr. Politi did search for mitigation – for instance, he talked to Lee about his background, his parents, his drug use; he spoke to Lee's parents, his ex-wife, and his brothers and sisters about his background, he instructed his investigator to search through Lee's medical records and school records, he had

1

2

3

4

some things reviewed by a mitigation expert, and he hired a doctor to examine Lee so that he could present the results at sentencing (although, for tactical reasons, he decided to present only the doctor's report and not his body). The fact that Mr. Politi found no, or very little, mitigation does not render his efforts ineffective. From this, I can find no evidence of *Strickland* prejudice to Mr. Lee. And defense counsel agrees for on page 7 of "Petitioner's Final Arguments" filed on June 18, 2002, he states, "The second prong of *Strickland* (prejudice) has not been met."

5

6

7

8

9

Although Lee's counsel takes Mr. Politi to task for not presenting any evidence of mitigation at the sentencing hearing, present counsel showed me nothing at the Rule 32 hearing that Politi should have presented. This is due, he says to the fact that his investigator was not given the time or the money to search. I disagree; his investigator was on the case for over 18 months and produced nothing and could point to nothing that was worth the court's money. I find from the evidence I heard that any lack of mitigation was due more to the fact that there was none, rather than to Politi's lassitude or incompetence.

10

(ROA-PCR-ME 34 at 2.) The Arizona Supreme Court summarily denied review.

11

Discussion

12

13

14

15

16

17

18

19

Petitioner contends that counsel failed to investigate his background and present this information to the mental health experts or the sentencing judge. (Doc. 52 at 160.) He asserts that counsel should have conducted more exhaustive interviews with himself and his immediate family; interviewed other family members, friends, and associates; and obtained additional life history records. (*Id.* at 160-65.) Petitioner further asserts that counsel was ineffective for failing to call any witnesses at the aggravation/mitigation hearing to humanize him or establish that he would pose no danger if sentenced to life imprisonment. (*Id.* at 162, 171.)

20

21

22

23

24

Petitioner argues that reasonably competent counsel would have uncovered significant evidence demonstrating that he had a difficult childhood, suffered from alcoholism, was in a drug-induced psychosis at the time of the offense, did not actually kill the victim, and would adjust well to life in prison. (*Id.* at 183.) Specifically, he alleges that a more thorough investigation would have revealed the following information about his background:

25

26

• He suffered from Attention Deficit Hyperactivity Disorder, depression, and alcoholism.

• He grew up in poverty.

27

28

• His father and grandfather were alcoholics, and his father was prone to violence.

- He suffered from depression throughout his life, which was never treated.

- He was a poor student and began drinking and using drugs at a young age.

- His parents are co-dependant and enabling.

- After commitment to a juvenile facility following a number of alcohol-related burglaries and thefts, he married his high school sweetheart and obtained a job but, after his younger brother was killed while attempting to burglarize the home of a drug dealer, Petitioner's alcoholism and drug use reemerged.

- While intoxicated, he pretended to have a weapon and committed a robbery.

- He adjusted well to life in prison, except for his drug addiction.

- After release from prison, he received a large worker's compensation settlement and spent all of it on drugs within eight months.

- In 1987, at age 30, he was diagnosed with alcoholic liver disease.

- Six months before the murder, he cracked the windshield of a car with his head following a high speed, alcohol-related accident.

- Weeks before the murder Petitioner was treated at an alcohol addiction center and was in a methamphetamine psychosis.

- During pretrial incarceration, Petitioner had no behavioral problems and was medicated with Xanax, an anti-anxiety drug.

(*Id.* at 161-62.)

In support of his claim, Petitioner has proffered declarations from his mother, sister, and brother-in-law; a social history report prepared by a mitigation specialist; prison records from his robbery conviction; and medical records. (Doc. 53, Exs. D, H–K; Doc. 88, Exs. E-G.) On September 29, 2006, this Court denied Petitioner's consolidated motion for discovery, an evidentiary hearing, and expansion of the record. (Dkt 87.) In doing so, the Court rejected Petitioner's contentions that the failure to develop these facts should be attributed to PCR counsel, not to him. (*Id.* at 30.) There is little question that PCR counsel could have obtained and presented to the state court the newly-proffered declarations and records; thus, Petitioner was not diligent in developing these facts in state court. *See* 28 U.S.C. § 2254(e)(2); *Williams v. Taylor*, 529 U.S. 420, 437-40 (2000) (finding no diligence where state habeas counsel failed to investigate). In his amended petition, Petitioner also appears

1   to argue that the failure to present a social history report in state court should be attributed

2   to the State because the PCR court "foisted upon him" an incompetent mitigation specialist.

3   (Doc. 52 at 182.)  However, this Court can discern no distinction between a state court's

4   appointment of a post-conviction attorney and an investigator; the actions of each are

5   attributable to the petitioner for the purpose of determining diligence under 28 U.S.C. §

6   2254(e)(2).  Because Petitioner was not diligent, the Court may not consider his new

7   evidence.  Even if it did, the Court concludes that the PCR court's findings and conclusions

8   were not objectively unreasonable.

9        *Scope of Investigation*

10        In assessing whether counsel's performance was deficient under *Strickland*, the test is

11   whether counsel's actions were objectively reasonable at the time of the decision.  *Strickland*,

12   466 U.S. at 689-90.  A reasonable mitigation investigation involves not only the search for

13   good character evidence but also evidence that may demonstrate that the criminal act was

14   "attributable to a disadvantaged background, or to emotional and mental problems[.]"  *See*

15   *Boyde v. California*, 494 U.S. 370, 382 (1990).  In *Wiggins*, 539 U.S. at 524, the Court

16   discussed the reasonableness of a mitigation investigation by evaluating it against the

17   appropriate ABA Guidelines for the Appointment and Performance of Counsel in Death

18   Penalty Cases. The 1989 Guidelines provide that mitigation investigations "should comprise

19   efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any

20   aggravating evidence that may be introduced by the prosecutor."  ABA Guidelines for the

21   Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) at 93 (1989)

22   (emphasis added).  Among the topics counsel should consider investigating are medical

23   history, educational history, employment and training history, family and social history, prior

24   adult and juvenile correctional experience, and religious and cultural influences.  *Wiggins*,

25   539 U.S. at 524.  The Court has also instructed, however, that the ABA Guidelines are

26   evidence of what reasonably diligent attorneys would do, not inexorable commands with

27   which all capital defense counsel must fully comply.  *Bobby v. Van Hook*, 130 S. Ct. 13, 17

28

1   (2009) (per curiam); *see Strickland*, 466 U.S. at 688 (noting that ABA Guidelines are guides

2   to reasonableness, not its definition).

3       In this case, the PCR court determined that Politi conducted a reasonable mitigation

4   investigation. Petitioner argues that this finding was "incorrect" because Politi was not

5   qualified to try a capital case, worked without co-counsel, failed to present "significant

6   events" in Petitioner's life, and failed to conduct a social history. (Doc. 52 at 177-78.) He

7   further asserts there is no evidence to support the PCR court's finding that Politi spoke to

8   Petitioner as well as his parents, ex-wife, and siblings about his background and drug use;

9   that counsel's investigator searched for medical and school records; that counsel had some

10  things reviewed by a mitigation specialist; or that counsel hired a doctor to examine

11  Petitioner for sentencing. (*Id.* at 178-81.) The Court disagrees.

12      The record developed at the PCR hearing clearly supports the PCR court's

13  determination that Politi conducted an adequate mitigation investigation. Politi focused on

14  obtaining information from Petitioner and his family, gathering social history records, and

15  evaluating Petitioner's mental health. Well before trial began, counsel met with Petitioner

16  on several occasions to discuss his background, and either counsel or his investigator

17  interviewed Petitioner's parents, his brother, and one of Petitioner's ex-wives. *Cf. Williams*

18  *v. Taylor*, 529 U.S. at 395-96 (finding deficient performance where counsel waited "until a

19  week before trial" to prepare for the sentencing phase and failed to discover "records

20  graphically describing Williams' nightmarish childhood" and fact he was "borderline

21  mentally retarded"). The defense team obtained available birth, school, medical,

22  incarceration, and probation records. Politi also had Petitioner examined by a psychiatrist

23  to look for potential mitigating circumstances, including whether Petitioner's alcohol and

24  drug intoxication at the time of the crime affected his ability to control his conduct.

25      Through these efforts, counsel learned that Petitioner was a high-school dropout who

26  drank and took drugs excessively, that he was a long-time alcoholic whose abuse of drugs

27  escalated prior to the crime, that his grandfather was an alcoholic, that the death of his

28

- 63 -

brother had a devastating impact on his life, that his parents were overprotective, that his drinking occasionally led to alcoholic blackouts, and that he was treated for depression while incarcerated for robbery. Although additional family members and friends were available to be interviewed, Petitioner did not establish at the PCR hearing that such efforts would have uncovered significant information about Petitioner's life that was not already known to counsel, either from Politi's own interviews, his investigator's efforts, or the social history documented by Dr. Garcia-Buñuel. *See Bobby v. Van Hook*, 130 S. Ct. at 19 ("[T]here comes a point at which evidence from more distant relatives can reasonably be expected to be only cumulative."). Petitioner's mitigation specialist during the PCR hearing testified that, due to an alleged lack of resources, she had not conducted any interviews or gathered any records and, consequently, was unable to demonstrate what Politi could have uncovered had he conducted more thorough interviews of family members; spoken to Petitioner's friends, teachers, co-workers, and employers; or gathered more records. (RT 4/17/02 at 210-15.)

In these proceedings, Petitioner enlisted the assistance of a new mitigation specialist, who opines that Politi's investigation "was cursory at best, and in no way represents the kind of meticulous, detailed investigation" required in a capital sentencing proceeding. (Doc. 53, Ex. H, Attach. at ¶ 5.) She acknowledges that counsel obtained some records, but insists he should have collected "all" of them. (*Id.* at ¶ 10.) She also states that most records have since been destroyed and that relevant witnesses such as teachers and employers are no longer available. (*Id.* at ¶¶ 10-11, 33.) From the records she was able to gather and through more extensive interviews of Petitioner's family, the mitigation specialist has prepared a lengthy and detailed narrative of Petitioner's life. (*See* Doc. 53, Ex. H.)

After reviewing this social history report, the Court discerns only the following items that Politi may not have learned from his own investigation: that Petitioner suffered from Attention Deficit Hyperactivity Disorder; that before joining a Pentecostal church, Petitioner's father was a violent alcoholic who abused his wife during Petitioner's preteen

years; that Petitioner had a history of depression that began in childhood; and that Petitioner made several attempts to get help for his alcoholism.[14] (*Id.* at 6; *see also* Doc. 53, Ex. H at 1-3.) This information is far less "powerful" than that uncovered in cases in which counsel's investigation was found to be constitutionally deficient.

In *Wiggins*, for example, counsel failed to discover that the defendant suffered consistent abuse during the first six years of his life, was the victim of "physical torment, sexual molestation, and repeated rape during his subsequent years in foster care," was homeless for portions of his life, and had diminished mental capacities. 539 U.S. at 528-29, 535. In *Rompilla v. Beard*, counsel failed to review a prior conviction file that would have revealed that Rompilla had been beaten by his father with fists, straps, belts, and sticks; that his father locked him and his brother in a dog pen filled with excrement; and that he grew up in a home with no indoor plumbing and was not given proper clothing. 545 U.S. 374, 383-84, 392 (2005). In *Porter v. McCollum*, counsel collected no records, conducted no interviews, and had only one short meeting with his client concerning the penalty phase; a reasonable investigation would have revealed that the defendant was abused as a child, served heroically in the Korean War but experienced trauma therefrom, had a long-term substance abuse problem, and had impaired mental health and mental capacity. 130 S. Ct. 447, 449, 453 (2009). Similarly, there is no evidence to suggest that any of the records Politi collected or that Petitioner has proffered in these proceedings would have served to alert counsel to the type of information at issue in *Williams v. Taylor*, 529 U.S. at 395, where the defendant was borderline mentally retarded and had suffered maltreatment and abuse from parents who had been jailed for criminal neglect.

---

[14]   The record does not actually establish whether Politi was aware of these aspects of Petitioner's history; he was not asked during the PCR hearing about the substance of his conversations with Petitioner concerning Petitioner's background. In addition, the mitigation specialist's report states simply that family members "believe" Petitioner suffered from Attention Deficit Hyperactivity Disorder; there is no evidence that this disorder was diagnosed by a medical profession. (Doc. 53, Ex. H at 11.)

Petitioner also complains that counsel neglected to provide Dr. Garcia-Buñuel with the records he had collected. However, both the doctor's report and counsel's work log reflect that Politi met with Garcia-Buñuel both before and after the doctor met with Petitioner. Though the question was not specifically addressed during the PCR hearing, it is likely that counsel shared his knowledge of Petitioner's background during one or both of these meetings. In addition, Politi's work log reveals that he provided Garcia-Buñuel with hospital records from incidents on July 26, 1984, and April 10, 1991.[15]  (Doc. 90-1 at 39.)  In any event, Petitioner does not allege that Dr. Garcia-Buñuel's diagnostic conclusions would have differed in any way had he been provided the type of detailed narrative of Petitioner's life developed in this habeas proceeding.

In sum, even considering the new social history report that was not developed or presented in state court, this Court concludes that this

> is not a case in which the defendant's attorneys failed to act while potentially powerful mitigating evidence stared them in the face, *cf. Wiggins*, 539 U.S. at 525, or would have been apparent from documents any reasonable attorney would have obtained, *cf. Rompilla v. Beard*, 545 U.S. [at] 389-93.  It is instead a case, like *Strickland* itself, in which defense counsel's "decision not to seek more" mitigating evidence from the defendant's background "than was already in hand" fell "well within the range of professionally reasonable judgments."  466 U.S. at 699.

*Van Hook*, 130 S. Ct. at 19.

*Presentation of Mitigation Evidence*

Petitioner also argues that counsel's representation at sentencing was deficient because Politi failed to present any live witnesses to humanize Petitioner and present his social history to the sentencing judge.  Petitioner does not cite any case law suggesting that the failure to present evidence at sentencing through live witnesses is *per se* deficient.  In at least

---

[15]    In the social history report proffered in these proceedings, the mitigation specialist explains that Petitioner went to a hospital on July 22, 1984, following a fight with his brother, and four days later returned to the emergency room complaining of dizziness and nausea. (Doc. 53, Ex. H at 29-30.)  On April 10, 1991, Petitioner was found unconscious at a fast food restaurant; he smelled strongly of alcohol and was taken to a hospital where his stomach was pumped.  (*Id.* at 33.)

one case, the Ninth Circuit found deficient performance where counsel waived the presentation of evidence at a presentence hearing by presenting neither live testimony nor any documentary evidence. *Correll v. Ryan*, 539 F.3d 938, 946-47 (9th Cir. 2008). Here, however, Politi conducted an adequate investigation into Petitioner's background, submitted a detailed memorandum arguing against each of the State's alleged aggravators and urging numerous statutory and nonstatutory mitigating circumstances, and presented an expert report, school records, and a letter from Petitioner's mother at a presentence hearing. In addition, the court's probation department prepared a PSR that set forth a fairly extensive social history, including the fact that Petitioner's father used to be an alcoholic who abused his wife, that Petitioner had been married and divorced twice due to his alcohol problems, and that he had tried to get help for his addiction. Thus, this information was already known to the sentencing judge, and the failure to present lay social history witnesses was not unreasonable. At the PCR evidentiary hearing, counsel explained that he did not call Petitioner's parents because they were having trouble coping with what had happened and because they were the ones that first reported Petitioner to the police. In addition, Petitioner continued to maintain his innocence to his parents. Thus, the prosecution could have elicited testimony that would have undermined Politi's arguments that Petitioner's admission of guilt and remorse constituted mitigating circumstances. In addition, the prosecution could have emphasized the fact that Petitioner repeatedly got into trouble despite the strong support provided by his family, thus countering the assertion that he was amenable to rehabilitation.[16] In lieu of her testimony, counsel proffered a heartfelt letter from Petitioner's mother, pleading that her son's life be spared. On this record, Politi's decision not to call Petitioner's parents fell within counsel's wide latitude in making tactical decisions. *See Gerlaugh v. Stewart*, 129 F.3d 1027, 1033 (9th Cir. 1997) (stating that counsel knew about evidence but

---

[16]        Moreover, Petitioner's new social history report indicates that he stole from his parents and brother to feed his drug addiction. (Doc. 53, Ex. H at 36.) This undoubtedly would have come out during any cross-examination of Petitioner's family members.

chose as a tactical matter not to use it); *see also Cox v. Del Papa*, 542 F.3d 669, 683 (9th Cir. 2008) (finding reasonable counsel's decision not to present live testimony from defendant's wife, who was separated from defendant and had not seen him in three years, given risk of cross-examination).

Nor was it unreasonable to rely on Dr. Garcia-Buñuel's report rather than have him testify. The doctor advised Politi against calling him as a witness because the prosecution could elicit on cross-examination that any brain damage Petitioner might suffer would not explain why he participated in the crime. Similarly, the prosecution could have emphasized Petitioner's detailed recollection of the offense to Dr. Garcia Buñuel, thus calling into question his conclusion that Petitioner's ability to control his conduct was impaired by cocaine intoxication. In addition, calling Dr. Garcia-Buñuel may have spurred the prosecution to either elicit testimony from Dr. Bayless or to ask the court to consider Bayless's report as rebuttal evidence. *See Harris v. Vasquez*, 949 F.2d 1497, 1525 (9th Cir. 1990) (observing that it is "acceptable trial strategy to choose not to call psychiatrists to testify when they can be subjected to cross-examination based on equally persuasive psychiatric opinions that reach a different conclusion"). Both Petitioner's denial of his role in the crime to Dr. Bayless and the doctor's conclusion that Petitioner suffered from an anti-social personality disorder would have undermined Petitioner's alleged mitigating circumstances.

Admittedly, counsel could have asked Petitioner's family members or ex-wives to testify concerning Petitioner's history of drug and alcohol addiction as well as his efforts at rehabilitation. However, this Court's inquiry is not on what "defense counsel could have presented, [but] whether counsel's actions were reasonable." *Turner v. Calderon*, 281 F.3d 851, 877 (9th Cir. 2002). The fact that Petitioner was addicted to alcohol and cocaine was established by both Dr. Garcia-Buñuel and the PSR. In addition, the sentencing judge expressly found that Petitioner was under the influence of cocaine at the time of the crime, noting that he had injected cocaine numerous times on December 5, 1991, from

approximately 2:00 p.m. through immediately before the killing.   (RT 3/8/93 at 26.)
Additional evidence dwelling on Petitioner's addictions and failed attempts at rehabilitation
could have hurt as much as helped his mitigation case.  Courts have repeatedly observed that
evidence of drug and alcohol abuse is often a "double-edged sword" because it is equally
possible a sentencer will fault a defendant for his repeated failures to effectively address an
addiction problem or construe him as a continuing threat to society.  *Wackerly v. Workman*,
580 F.3d 1171, 1178 (10th Cir. 2009); *Tompkins v. Moore*, 193 F.3d 1327, 1338 (11th Cir.
1999).  Indeed, the sentencing judge here found that Petitioner's "past history of substance
abuse and criminal activities make it likely that he would commit further criminal acts if
allowed." (RT 3/8/93 at 29.)  Politi's failure to present lay testimony concerning Petitioner's
long-standing addiction problems was not unreasonable.

*Prejudice*

Even assuming it was unreasonable for counsel not to further investigate Petitioner's
background or to present witnesses to testify concerning Petitioner's social history, the Court
concludes that Petitioner was not prejudiced.  In assessing prejudice at sentencing, "the
question is whether there is a reasonable probability that, absent the errors, the sentencer . . .
would have concluded that the balance of aggravating and mitigating circumstances did not
warrant death."  466 U.S. at 695.  In *Wiggins*, the Court further noted that "[i]n assessing
prejudice, we reweigh the evidence in aggravation against the totality of available mitigating
evidence."   539 U.S. at 534.  The totality of the available evidence includes "both that
adduced at trial, and the evidence adduced in the habeas proceeding."  *Id.* at 536 (quoting
*Williams v. Taylor*, 529 U.S. at 397-98).

In a post-hearing brief during the state PCR proceeding, Petitioner conceded that he was
unable to meet *Strickland*'s prejudice prong because in his opinion the mitigation specialist
had not been given sufficient time or money to carry out an investigation.  (ROA-PCR 93 at
7.)  The PCR court disagreed, finding that the "investigator was on the case for over 18
months and produced nothing and could point to nothing that was worth the court's money."

(ROA-PCR-ME 34 at 2.)  The court further concluded that "any lack of mitigation was due more to the fact that there was none, rather than to Politi's lassitude or incompetence."  (*Id.*) On the record as developed in state court, Petitioner does not assert, and this Court does not find, that the PCR court's ruling was objectively unreasonable.  Instead, Petitioner argues that the PCR court's ruling was "incorrect as illustrated by the mitigation produced by [mitigation specialist] Janet Dowling in this habeas proceeding."  (Doc. 52 at 182.)

The Court has already determined that the failure of Petitioner's PCR investigator to develop evidence in support of this claim is not attributable to the State but rather demonstrates Petitioner's lack of diligence in state court.  Accordingly, this Court may not consider Petitioner's new evidence because he failed to develop the factual basis of the claim in state court and has not satisfied the requirements of 28 U.S.C. § 2254(e)(2).  However, even considering the new social history report, the Court concludes that Petitioner has not demonstrated prejudice.

The sentencing judge was aware, through Dr. Garcia-Buñuel's report, Petitioner's high school records, Mrs. Lee's letter, and the PSR that Petitioner was a high-strung, low intelligence child who dropped out of high school, that he was loved and supported by his family, that his father was at one time an alcoholic who beat his wife before starting to attend church and becoming a "new person," that his grandfather was an alcoholic, that at some point a brother had died and this was a devastating loss for Petitioner, that he was an alcoholic who tried to get sober by joining Alcoholics Anonymous and checking himself into a rehabilitation facility, that he had two failed marriages due to his alcohol abuse and infidelity, that he had started using drugs at a young age, that at the time of the offense his life was directed to the habitual consumption of cocaine and he was under the influence of the drug during the crime, and that he was remorseful.  The court expressly found that Petitioner had proven by a preponderance of the evidence the following mitigating factors: remorse, admission of guilt, lack of education, low intelligence, strong family support, the fact that the defendant was a follower, Thompson's life sentence, and the prosecution's

1    recommendation of a life sentence.

2         Unquestionably, Dowling's social history report paints a more detailed picture of

3    Petitioner's family, upbringing, and struggle with drugs and alcohol.  It does not, however,

4    add any significant new information that was not before the sentencing judge.  *See Van Hook*,

5    130 S. Ct. at 19 (finding no prejudice where "nothing of value" contained in new witness

6    affidavits); *Wong v. Belmontes*, 130 S. Ct. 383, 388 (2009) (per curiam) (finding no prejudice

7    where new "humanizing evidence" was mostly cumulative of that presented at sentencing).

8    Moreover, Petitioner has not proffered any evidence to substantiate his claim that he suffers

9    from Attention Deficit Hyperactivity Disorder and, with the exception of his history of

10   depression, the "highlights" identified in Petitioner's amended petition (Doc. 52 at 161-62)

11   were contained in the materials considered by the sentencing court.  The new information

12   does not present a significantly different picture of Petitioner, and therefore "would barely

13   have altered the sentencing profile presented to the sentencing judge."  *Strickland*, 466 U.S.

14   at 700.  *See Hill v. Mitchell*, 400 F.3d 308, 319 (6th Cir.2005) ("to establish prejudice, the

15   new evidence that a habeas petitioner presents must differ in a substantial way – in strength

16   and subject matter – from the evidence actually presented at sentencing"); *Babbitt v.*

17   *Calderon*, 151 F.3d 1170, 1176 (9th Cir. 1998) (finding no prejudice where evidence omitted

18   at sentencing was "largely cumulative of the evidence actually presented"); *Woratzeck*, 97

19   F.3d at 336-37 (finding no prejudice from counsel's failure to investigate or call additional

20   witnesses at mitigation phase because all of the information the witnesses would have

21   presented was contained in the presentence report).

22        *Conclusion*

23        After carefully reviewing the state court record, as well as the evidence Petitioner

24   neglected to develop in state court, this Court concludes that counsel's representation at

25   sentencing was neither deficient nor prejudicial as those terms are defined in *Strickland*.

26   Applying the "doubly deferential" standard required by the AEDPA, *see Mirzayance*, 129

27   S. Ct. at 1420, the Court readily concludes that the state court's denial of relief was not based

28

on an unreasonable application of law or determination of fact.

**Claim 9-E**

In his amended petition, the heading of Claim 9-E reads: "Trial Counsel Failed to Get and Present a Meaningful Psychiatric Evaluation of the Petitioner." (Doc. 52 at 184.) However, in the accompanying argument Petitioner alleges that he was tried, convicted, and sentenced while mentally incompetent in violation of *Godinez v. Moran*, 509 U.S. 389 (1993), and *Dusky v. United States*, 362 U.S. 402 (1962). (*Id.* at 187.) He also argues that counsel was ineffective for not challenging his competency for trial. (*Id.* at 188.) Respondents contend that neither of these claims were raised in state court. (Doc. 68 at 82, 90-91.) The Court agrees.

Petitioner did not fairly present any competency-related allegations on direct appeal or during PCR proceedings. The Court concludes that if Petitioner were to return to state court now and attempt to litigate these claims, they would be found waived and untimely under Rules 32.2(a)(3) and 32.4(a) because they do not fall within an exception to preclusion. *See* Ariz. R. Crim. P. 32.2(b); 32.1(d)-(h); *see also Martinez-Villareal v. Lewis*, 80 F.3d 1301, 1306-07 (9th Cir.1996) (holding that a claim alleging actual incompetence to stand trial is subject to the same state procedural default rules as other claims). Therefore, Petitioner's incompetency claim and the accompanying IAC claim are "technically" exhausted but procedurally defaulted because Petitioner no longer has an available state remedy. *See Smith*, 510 F.3d at 1137-38. Petitioner presents no cause and prejudice or fundamental miscarriage of justice arguments. (Doc. 73 at 37.) Therefore, Claim 9-E is procedurally barred.

**Claim 10-A**

Petitioner contends that appellate counsel was ineffective for failing to raise the issue of trial counsel's ineffective assistance in not requesting a second-degree murder instruction. (Doc. 52 at 189.) Petitioner acknowledges, however, that trial counsel did in fact request a second-degree murder instruction. (*Id.* at 189-90.) In addition, this claim was never presented in state court and is now procedurally barred.

1   Petitioner also argues that appellate counsel was ineffective for failing to argue that the

2   trial court erred in denying his request for a second-degree murder instruction.  (*Id.*)

3   Petitioner presented this argument during PCR proceedings and thus the claim was properly

4   exhausted in state court. (ROA-PCR 3.)  However, it is without merit.

5   Petitioner was charged on two theories of first-degree murder:  premeditated murder and

6   felony murder.  (ROA 2.)  At the end of trial, the court indicated that it was only going to

7   provide a jury instruction on first-degree murder.  (RT 11/17/92 at 228.)  Counsel requested

8   an instruction for second-degree murder, arguing that Thompson's testimony provided

9   sufficient evidence that she and Petitioner were under the heavy influence of cocaine and

10  alcohol and acted without premeditation or deliberation.  (*Id*. at 228-30.)  The court

11  disagreed, concluding, based on Petitioner's presentation of an alibi defense, that there was

12  insufficient evidence to support a lesser-included second-degree murder charge, and that

13  there was insufficient evidence upon which a jury could find that Petitioner participated in

14  the murder without premeditation.  (*Id*.)  Petitioner filed a motion for a new trial, which was

15  denied.  (ROA 79; ME 12/14/92.)  During PCR proceedings, the court denied Claim 10-A

16  as not colorable.  (ROA-PCR-ME 12.)

17  In *Beck v. Alabama*, 447 U.S. 625, 627 (1980), the Court held that the death penalty

18  may not be imposed if the jury was not permitted to consider a lesser-included non-capital

19  offense.  However, due process requires that a lesser-included-offense instruction be given

20  only when the evidence warrants such an instruction.  *Id*.; *see Hopper v. Evans*, 456 U.S.

21  605, 611 (1982); *Clabourne v. Lewis,* 64 F.3d 1373, 1380 (9th Cir. 1995) (noting that it is

22  plain error for the court to fail to give a lesser-included instruction on second-degree murder

23  in a capital case "where the evidence would permit a jury rationally to find [the defendant]

24  guilty of the lesser offense and acquit him of the greater").

25  Under Arizona law, there are no lesser-included homicide offenses for felony murder.

26  *State v. Lopez*, 163 Ariz. 108, 112, 786 P.2d 959, 963 (1990) (citing *State v. Celaya*, 135

27  Ariz. 248, 255, 660 P.2d 849, 856 (1983)).  Thus, with respect to the felony murder charge,

28

- 73 -

Petitioner's assertion that the evidence of intoxication presented at trial required the trial court to instruct on second-degree murder as a lesser-included offense necessarily fails.

Second-degree murder is a lesser-included offense of premeditated first-degree murder and is distinguished from the latter only by the element of premeditation. *See State v. Marvin*, 124 Ariz. 555, 557, 606 P.2d 406, 408 (1980); *Vickers v. Ricketts*, 798 F.2d 369, 371 (9th Cir. 1986). "Premeditation" means that a person acts with either "the intention or the knowledge" that he or she will kill another human being, when such intention or knowledge precedes the killing by a length of time to permit reflection. A.R.S. § 13-1101(1). In this case, the prosecution urged both mental states and the jury was instructed that to convict Petitioner of premeditated first-degree murder, they must find that:

> 1. The defendant caused the death of another person; and,
>
> 2. The defendant *intended* or *knew* that he would cause the death of another person; and
>
> 3. The defendant acted with premeditation.
>
> "Premeditation means that the defendant's *intention* or *knowledge* existed before the killing long enough to permit reflection. However, the reflection differs from the *intent* or *knowledge* that conduct will cause death. . . .

(ROA 71 (emphasis added).)

At the time of Petitioner's trial, A.R.S. § 13-503 provided that a jury could consider voluntary intoxication in determining culpable mental state only when the state of "intentionally or with the intent to" was a necessary element of the offense. However, when the State alleges both the "intentional" and "knowing" mental states for premeditated first-degree murder, Arizona law precludes the giving of a voluntary intoxication instruction. *See State v. Schurz*, 176 Ariz. 46, 55, 859 P.2d 156, 165 (1993) (holding that "knowing" is less culpable mental state than intent and thus the "intentional" component of first-degree murder becomes superfluous if both "knowing" and "intentional" are charged); *see also State v. Neal*, 143 Ariz. 93, 98, 692 P.2d 272, 277 (1984) (observing that voluntary intoxication negates only the "intentional" mens rea for first-degree murder).

1    Here, the jury was instructed on both the "intentional" and "knowing" mental states for

2    premeditated murder; thus, evidence of voluntary intoxication would not have been

3    admissible to negate premeditation (and establish second-degree murder).  Absent evidence

4    to negate premeditation, the giving of a lesser-included second-degree murder instruction

5    was not warranted.  *See Spaziano v. Florida*, 468 U.S. 447, 455 (1984) (*Beck* does not

6    require lesser-included instruction where no lesser-included offense exists).  Appellate

7    counsel's failure to raise a meritless argument does not constitute ineffective assistance.  *See*

8    *Wildman v. Johnson*, 261 F.3d 832, 840 (9th Cir. 2001) (appellate counsel not ineffective for

9    failing to raise issues that are without merit); *Boag v. Raines*, 769 F.2d 1341, 1344 (9th Cir.

10   1985) (same).

11   **Claim 10-B**

12   Petitioner alleges IAC of appellate counsel for failure to file a petition for writ of

13   certiorari to the United States Supreme Court. (Doc. 52 at 194-99.)  Respondents assert and

14   the Court finds that Petitioner did not fairly present this claim in state court. (Doc. 68 at 102-

15   03.)  The Court further finds that if Petitioner were to return to state court now and attempt

16   to litigate Claim 10-B, it would be found waived and untimely under Rules 32.2(a)(3) and

17   32.4(a) because it does not fall within an exception to preclusion.  *See* Ariz. R. Crim. P.

18   32.2(b); 32.1(d)-(h).  Therefore, this claim is "technically" exhausted but procedurally

19   defaulted because Petitioner no longer has an available state remedy. *See Coleman*, 501 U.S.

20   at 732, 735 n.1; *Smith*, 510 F.3d at 1138.  Petitioner raises the same cause, prejudice, and

21   fundamental miscarriage arguments already rejected by the Court in its discussion of Claim

22   3. (Doc. 73 at 38.)  Therefore, Claim 10-B is denied as procedurally barred.

23   **Claim 11**

24   Petitioner contends that he was deprived of the effective assistance of counsel during

25   his PCR proceedings in violation of the Sixth and Fourteenth Amendments. (Doc. 79 at 96-

26   114.)  Regardless of exhaustion, the Court will dismiss this claim as non-cognizable. *See* 28

27   U.S.C. § 2254(b)(2); *Rhines* v. Weber, 544 U.S. 269, 277 (2005).

28

1   Section 2254(i) provides that "[t]he ineffectiveness or incompetence of counsel during

2   Federal or State collateral proceedings shall not be a ground of relief in a proceeding arising

3   under section 2254." Moreover, Petitioner is not entitled to relief under Claim 11 because

4   only violations "of the Constitution or laws or treaties of the United States" may be litigated

5   in the context of a petition for writ of habeas corpus. 28 U.S.C. § 2254(a). Petitioner's

6   allegations regarding the effectiveness of PCR counsel are not cognizable on federal habeas

7   review because there is no constitutional right to the effective assistance of such counsel. *See*

8   *Pennsylvania v. Finley*, 481 U.S. at 555; *Murray*, 492 U.S. at 7-12 (noting that the

9   Constitution does not require states to provide counsel in PCR proceedings even when the

10  putative petitioners are facing the death penalty); *Bonin*, 999 F.2d at 429-30 (refusing to

11  extend the right of effective assistance of counsel to state collateral proceedings); *Harris*, 949

12  F.2d at 1513-14.

13  **Claim 12**

14  Petitioner alleges that execution after an extended period of incarceration on death row

15  fails to serve any legitimate penological purpose and violates his Eighth Amendment right

16  to be free from cruel and unusual punishment. (Doc. 52 at 204-09.) Regardless of

17  exhaustion, the Court will deny Claim 12 as plainly meritless. *See* 28 U.S.C. § 2254(b)(2);

18  *Rhines*, 544 U.S. at 277.

19  The Supreme Court has not held that lengthy incarceration prior to execution constitutes

20  cruel and unusual punishment. *See Lackey v. Texas*, 514 U.S. 1045 (1995) (mem.) (Stevens,

21  J. & Breyer, J., discussing denial of certiorari and noting the claim has not been addressed).

22  Circuit courts, including the Ninth Circuit, have held that prolonged incarceration under a

23  sentence of death does not offend the Eighth Amendment. *See McKenzie v. Day*, 57 F.3d

24  1493, 1493-94 (9th Cir. 1995) (en banc); *White v. Johnson*, 79 F.3d 432, 438 (5th Cir. 1996)

25  (delay of 17 years); *Stafford v. Ward*, 59 F.3d 1025, 1028 (10th Cir. 1995) (delay of 15

26  years). Accordingly, Petitioner cannot establish a right to federal habeas relief. *See Allen*

27  *v. Ornoski*, 435 F.3d 946, 958-60 (9th Cir. 2006).

28

- 76 -

1

**Claim 13**

2      Petitioner contends that his constitutional rights were violated by the cumulative effect

3   of the constitutional errors alleged in his amended petition.  (Doc. 52 at 209.)  Respondents

4   assert and the Court finds that Petitioner failed to present this claim to the state courts.  (Doc.

5   68 at 106.)  The Court further finds that Petitioner has no available state remedies.  *See* Ariz.

6   R. Crim. P. 32.2(b); 32.1(d)-(h).   Therefore, the claim is "technically" exhausted but

7   procedurally defaulted.  *See Coleman*, 501 U.S. at 732, 735 n.1; *Smith*, 510 F.3d at 1138.

8   Petitioner raises the same cause, prejudice, and fundamental miscarriage arguments already

9   rejected by the Court in its discussion of Claim 3.  Claim 13 is denied as procedurally barred.

10                                      **CONCLUSION**

11      The Court concludes that Petitioner is not entitled to habeas relief on any of his claims.

12   The Court further finds that an evidentiary hearing in this matter is neither warranted nor

13   required.[17]  Therefore, Petitioner's Amended Petition for Writ of Habeas Corpus is denied

14   and judgment shall be entered accordingly.

15                              **CERTIFICATE OF APPEALABILITY**

16      Rule 22(b) of the Federal Rules of Appellate Procedure provides that an applicant

17   cannot take an appeal unless a certificate of appealability has been issued by an appropriate

18   judicial officer.  Rule 11(a) of the Rules Governing Section 2254 Cases provides that the

19   district judge must either issue or deny a certificate of appealability when it enters a final

20   order adverse to the applicant.  If a certificate is issued, the court must state the specific issue

21   or issues that satisfy 28 U.S.C. § 2253(c)(2).  Pursuant to 28 U.S.C. § 2253(c)(2), a COA

22   may issue only when the petitioner "has made a substantial showing of the denial of a

23   constitutional right."  This showing can be established by demonstrating that "reasonable

24   jurists could debate whether (or, for that matter, agree that) the petition should have been

25

26         [17]   The Court previously denied Petitioner's request for evidentiary development

27   as to specific claims (Doc. 87), but has now conducted an independent review as to all of
     Petitioner's claims as required by Rule 8 of the Rules Governing Section 2254 Cases.

28

resolved in a different manner" or that the issues were "adequate to deserve encouragement to proceed further." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)).   For procedural rulings, a COA will issue only if reasonable jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct. *Id.*   The Court finds that reasonable jurists could debate its resolution of Claim 9-A, Whether trial counsel's presentation of a "false" alibi defense constituted ineffective assistance of counsel; Claim 9-B, Whether trial counsel's failure to fully investigate a voluntary intoxication defense constituted ineffective assistance of counsel; and Claim 9-D, Whether trial counsel's investigation and presentation of relevant mitigating evidence at sentencing constituted ineffective assistance of counsel.

For the reasons stated in this order and its September 29, 2006 order (Doc. 87), the Court declines to issue a COA with respect to any other claims.

Based on the foregoing,

**IT IS HEREBY ORDERED** that Petitioner's Amended Petition for Writ of Habeas Corpus (Doc. 52) is **DENIED WITH PREJUDICE.**   The Clerk of Court shall enter judgment accordingly.

**IT IS FURTHER ORDERED** that the stay of execution entered on January 14, 2004 (Doc. 3) is **VACATED**.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is **GRANTED** as to the following issues:

Claim 9-A:  Whether trial counsel's presentation of a "false" alibi defense constituted ineffective assistance of counsel.

Claim 9-B:  Whether trial counsel's failure to fully investigate a voluntary intoxication defense constituted ineffective assistance of counsel.

Claim 9-D:  Whether trial counsel's investigation and presentation of relevant mitigating evidence at sentencing constituted ineffective assistance of counsel.

**IT IS FURTHER ORDERED** that the Clerk of Court send a courtesy copy of this

Order to Rachelle M. Resnick, Clerk of the Arizona Supreme Court, 1501 W. Washington, Phoenix, Arizona 85007-3329.

DATED this 30th day of September, 2010.

Mary H. Murgula
United States District Judge